# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

      *Plaintiff,*

      v.

Paul E. Johnson

      *Defendant.*

Case No.: 0:26-MJ-00081-KMM-SGE

**BRIEF OF *AMICI CURIAE* FORMER U.S. MILITARY LAWYERS IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE APPEARANCE OF GOVERNMENT'S COUNSEL**

Zachary T. West*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 163
Washington, DC 20006
Tel: (202) 579-4582
Fax: (202) 769-3176
zachary.west@protectdemocracy.org

Beau C. Tremitiere*
PROTECT DEMOCRACY PROJECT
300 Center Ave, Suite G-251
Superior, CO 80027
Tel: (202) 579-4582
Fax: (202) 769-3176
beau.tremitiere@protectdemocracy.org

*Counsel for Amici Curiae*

John R. Marti
   *Counsel of Record*
Dorsey & Whitney LLP
50 South 6th St, Suite 1500
Minneapolis, MN 55402
Tel: (612) 492-6775
Fax: (612) 677-3265
marti.john@dorsey.com

*Motions for admission Pro Hac Vice forthcoming*

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST OF AMICI CURIAE ...............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT........................................3

ARGUMENT ...................................................................................................4

   I.   The Posse Comitatus Act prohibits a JAG from prosecuting a civilian in a case with no military nexus. ...........................................................................4

   II.   This prosecution does not satisfy any exception to the Posse Comitatus Act "expressly authorized" by the Constitution or federal law. .........................11

   III.   The government also violated binding Army regulations that explicitly limit JAG participation to prosecutions with a military "interest." .......................16

CONCLUSION ...............................................................................................20

# **STATEMENT OF INTEREST OF AMICI CURIAE**[1]

*Amici* are eleven former U.S. military judge advocate officers (JAGs) who served as military attorneys in the Army, Navy, Air Force, Marine Corps, and Coast Guard, advising commanders on administrative, criminal, regulatory, and international law, in addition to serving as military judges, prosecutors, defense counsel, JAG School instructors and service academy professors, and legal assistance attorneys supporting servicemembers and their families. During their military service, some *amici* were appointed as Special Assistant U.S. Attorneys (SAUSAs) and detailed to the Department of Justice (DOJ) to handle matters with a clear and substantial nexus to military affairs. Some *amici* also served in the DOJ as full-time federal prosecutors after completing their military service. Some *amici* teach law at civilian law schools. *Amici* therefore possess a unique professional, personal, and scholarly understanding of the military and civilian justice systems, the important and distinct constitutional values each advances, and the limited circumstances in which they can lawfully overlap.

*Amici* are identified below. Their abbreviated biographies are included in the Appendix.

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* contributed money to fund this brief's preparation or submission.

- Eugene R. Fidell

- B. Todd Jones

- Charles Kovats

- Jason Lien

- Major General Steven J. Lepper, U.S. Air Force (Ret.)

- John Marti

- Lieutenant Colonel Daniel Maurer, U.S. Army (Ret.)

- Rear Admiral James E. McPherson, U.S. Navy (Ret.)

- Steven L. Schleicher

- Hank Shea

- Andrew Winter

*Amici* submit this brief to ensure that the perspective of experienced former military legal professionals is represented before this Court. They have a profound interest in preserving the bedrock constitutional principle of civilian control of the military, safeguarding independent civilian prosecutorial discretion, maintaining the Posse Comitatus Act's vital boundaries, and thereby protecting and promoting the rule of law. They are deeply concerned that deploying JAGs to prosecute civilians in federal court in cases without a substantial military nexus erodes vital democratic norms, harms military readiness, and impermissibly inserts the military into civilian law enforcement's core functions.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, the government has detailed JAGs as SAUSAs to prosecute offenses committed by civilians on military installations, generally before federal magistrate judges. This arrangement has traditionally been construed to allow the military services to take part in cases in which they had a clear and defined interest—such as traffic violations committed on military installations subject to exclusive federal criminal jurisdiction—while giving courtroom experience to junior JAG officers.

However, the government recently expanded this practice far beyond its historical and statutory bounds. Public reporting suggests that the government has detailed dozens of JAGs to U.S. Attorney's Offices in Minnesota, Washington, D.C., and Tennessee, backfilling vacancies left by civilian resignations.[2] During these temporary duty assignments, JAGs are not prosecuting cases with a nexus to the U.S. military. Instead, they are prosecuting civilians for the kind of general, domestic federal offenses that civilian DOJ prosecutors would normally handle.

---

[2] *See Department of War Assigns 20 Military Lawyers to Serve as Special Assistant U.S. Attorneys in Memphis*, U.S. Att'y's Off., W. Dist. of Tenn. (Jan. 7, 2026), https://www.justice.gov/usao-wdtn/pr/department-war-assigns-20-military-lawyers-serve-special-assistant-us-attorneys; Thomas Novelly, *JAGs Are Becoming Federal Prosecutors in Minneapolis. Experts Warn It's New Territory*, Defense One (Jan. 29, 2026), https://www.defenseone.com/policy/2026/01/jags-are-becoming-federal-prosecutors-minneapolis-experts-warn-its-new-territory/411064/.

That is true in this case, where the sole government counsel—an Army JAG officer—is assigned to prosecute a civilian defendant for an alleged crime concerning only civilians and unrelated to any military installation, service members, property, investigating agencies, or operations.

Below, *amici* explain why it is unlawful for JAGs to prosecute civilians in cases with no military nexus. First, this novel practice violates the Posse Comitatus Act, 18 U.S.C. § 1385, which reflects the "traditional and strong resistance of Americans to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Second, neither the Constitution nor federal law "expressly" authorizes this practice as an exception to the Posse Comitatus Act. Third, this prosecution of a civilian by an Army JAG officer violates mandatory Army regulations which prohibit such prosecutions unless there is an Army "interest" in the matter. Accordingly, this Court should grant Mr. Johnson's motion to strike the appearance of government counsel. ECF No. 24.

## **ARGUMENT**

I.    **The Posse Comitatus Act prohibits a JAG from prosecuting a civilian in a case with no military nexus.**

The American tradition of separating the military from civilian law enforcement is foundational to our Republic. As the Supreme Court has "long recognized," "the military is, by necessity, a specialized society separate from

civilian society." *Parker v. Levy*, 417 U.S. 733, 743 (1974). The Founders forged their deep aversion to a domestic military presence in the crucible of the British occupation and violent clashes like the Boston Massacre. In the Declaration of Independence, Thomas Jefferson indicted King George III for affecting "to render the Military independent of and superior to the Civil power."

This principle of civilian supremacy is embedded into the Constitution's very structure. Article I, Section 8, Clause 14 vests in Congress the exclusive authority to "make Rules for the Government and Regulation of the land and naval Forces," ensuring that the military operates under laws enacted by civilian representatives accountable to the people. Article II, Section 2, Clause 1 designates the President as Commander in Chief of the armed forces, subordinating military command to elected civilian leadership. Along with the Third Amendment's prohibition on the quartering of soldiers in private homes, these provisions reflect a foundational commitment to ensuring the military is subordinate to civil authorities.

The Posse Comitatus Act of 1878 was born out of this same constitutional tradition. Following the Civil War, federal troops were used for law enforcement in the ex-Confederate states, acting as the police force for locally unpopular

governments.[3] Following this brief departure from settled precedent during the turbulent Reconstruction period, Congress then passed the Posse Comitatus Act to end the use of the military for domestic law enforcement.

The Posse Comitatus Act prohibits the willful use of any federal military personnel "to execute the laws" unless "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Federal courts have applied three tests to decide whether the government has violated the Posse Comitatus Act:

- The *Red Feather* test – was the military involvement in civilian law enforcement "direct" and "active." *United States v. Red Feather*, 392 F. Supp. 916, 922–23 (D.S.D. 1975) (explaining that "direct active use" includes making arrests, seizing evidence, searching persons or buildings, interviewing witnesses, or pursuing suspects).

- The *Jaramillo* test – did the military involvement in question pervade the civilian law enforcement activities. *United States v. Jaramillo*, 380 F. Supp. 1375, 1379 (D. Neb. 1974) (dismissing an indictment after finding a reasonable doubt whether federal authorities were lawfully engaged in their duties when military personnel counseled civilian law enforcement on use of force decisions, advised on negotiating tactics, and dictated defensive restrictions on the use of armored vehicles).

- The *McArthur* test – was the use of the military in civilian law enforcement regulatory, proscriptive, or compulsory in nature over civilians. *United States v. McArthur*, 419 F. Supp. 186, 194 (D.N.D. 1975); *see also United States v. Yunis*, 681 F. Supp. 891, 895–96 (D.D.C. 1988) (explaining that "regulatory" power "controls or directs," "proscriptive" power "prohibits or condemns," and "compulsory" power "exerts some coercive force").

---

[3] *See* Joseph Nunn, *The Posse Comitatus Act Explained*, Brennan Ctr. for Just. (Oct. 14, 2021), https://www.brennancenter.org/our-work/research-reports/posse-comitatus-act-explained.

In *Bissonette v. Haig*, the Eighth Circuit refined the *McArthur* test to ask whether military involvement in civilian law enforcement "actually regulates, forbids, or compels some conduct on the part of those claiming relief," with the "mere threat of some future injury" insufficient. 776 F.2d 1384, 1390 (8th Cir. 1985).

Here, the government is violating the Posse Comitatus Act under each of these tests by detailing a JAG officer to serve as Mr. Johnson's prosecutor. A JAG prosecuting a civilian exercises direct and active military involvement and influence in civil law enforcement, specifically through the control of criminal investigations, charging decisions, defense negotiations, interviewing witnesses, and making sentencing recommendations. In the same way, the JAG officer's direction and execution of the prosecution pervades the core of civilian law enforcement activities–he exercises discretion over material aspects of the case, in a manner that far exceeds the mere "advice" in *Jaramillo*, 380 F. Supp. at 1381. Finally, he exercises "regulatory" power by deciding whether to initiate a case and what charges to file; "proscriptive" power by bringing the weight of the federal government to condemn a defendant; and "compulsory" power by exerting coercive force to secure a conviction and expose the defendant to punishment, including incarceration.

This case is fundamentally different from the routine cases involving a clear and substantial military nexus where *amici* and other JAG officers have served lawfully as SAUSAs. The military may engage in "the execution of the law" without breaching the Posse Comitatus Act only when those actions are focused on prosecuting military personnel or enforcing military base safety and security. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* at 49–54 (updated Nov. 6, 2018) (discussing cases). For example, military police may stop, search, and arrest civilians suspected of committing crimes on military bases. *Id.* at 50. Likewise, a JAG officer does not violate the Posse Comitatus Act by serving as a SAUSA to prosecute a civilian for an offense occurring on a military base or otherwise having a clear and substantial military nexus.

Assigning JAG officers to prosecute off-base, general civilian crimes lacks this necessary military nexus. When an offense occurs off-base and involves only civilians, there is no military exigency or any non-exigent military interest that justifies military intrusion into the civilian criminal justice system. Divorced from a military purpose, a JAG officer's assignment as a prosecutor of a civilian falls squarely within the prohibited scope of the Posse Comitatus Act and manifests the danger that Congress sought to avoid: the unlawful substitution of civilian law

enforcement personnel with military personnel, threatening to render the civilian community subordinate to military commands.

Here, there is no dispute over a lack of military nexus. The government concedes that "[t]here are no facts in this case involving military personnel." Gov't Resp. at 7. Not only does Mr. Johnson have no military service connection, the alleged crime did not implicate military base security or safety; it did not occur on a military installation; none of the alleged victims are military members; there was no threat to any military community; there is no alleged theft, destruction, or unauthorized use of military property; a military agency was not the originating investigative agency; and there is no claim that this alleged crime impacted the military's maintenance of good order and discipline within its ranks or obstructed any military missions.

The consequences of employing the military–through any of its JAG officers–to "execute the law," as the government has done here, are severe. To civilians, it may appear the government is deploying the military to prosecute the cases that career Department of Justice attorneys would or could not. That appearance is harmful to our civil-military relations because it suggests military-led law enforcement is the catch-all substitute for regular civilian constitutional due process. So too, diverting JAGs to prosecute domestic civilian crimes siphons them away from their critical military duties. JAG officers are indispensable to

military readiness: they ensure compliance with the law of armed conflict, prosecute and defend courts-martial to maintain unit discipline, and provide legal assistance to deploying troops and those at military installations around the world.

The substitution of civilian attorneys with military attorneys also bypasses the democratic safeguard of prosecutorial discretion. When civilian prosecutors are instructed by their superiors to pursue legally flawed or ethically suspect cases, they can resign, as they have done in this District.[4] But JAGs do not have this option—they must obey their military superior's lawful orders upon possible penalty of criminal prosecution under the Uniform Code of Military Justice (UCMJ) or other adverse administrative consequences that would likely be career-detrimental.[5] By detailing JAG officers to backfill vacancies left by civilian prosecutors to manage the regular criminal docket, the federal government is not solving a staffing shortage; it is circumventing institutional checks on the abuse of state power.[6] As retired U.S. Army Lieutenant General Mark Hertling observed,

---

[4] *See* Ben Penn, *DOJ Turns to Military Lawyers as Minnesota Prosecutors Quit*, Bloomberg Law: U.S. L. Wk. (Jan. 15, 2026), https://news.bloomberglaw.com/us-law-week/military-fraud-lawyers-replacing-minnesota-prosecutors-who-quit.
[5] *See* 10 U.S.C. § 890, 892 (UCMJ offenses of willfully disobeying a superior commissioned officer and failure to obey an order or regulation).
[6] To the extent there are legitimate concerns around staffing needs in the Department of Justice, there are thousands of civilian lawyers employed by the federal government who the Attorney General could appoint as SAUSAs without implicating the Posse Comitatus Act. *See* OFFICE OF PERSONNEL MGMT., Workforce Size & Composition, https://data.opm.gov/explore-data/analytics/workforce-size-and-composition (last visited Mar. 3, 2026)

replacing civilian prosecutors with JAGs is an attempt to "bypass professional judgment and ethos" and treat the JAG Corps as a "reservoir of compelled compliance."[7]

## II. This prosecution does not satisfy any exception to the Posse Comitatus Act "expressly authorized" by the Constitution or federal law.

Having established that the government's detailing of a JAG officer to this prosecution constitutes a *prima facie* violation of the Posse Comitatus Act, the next question is whether an "express[]" constitutional or statutory exception applies. The answer is clear: no. While Congress has authorized JAG officers to participate in certain criminal prosecutions with a clear and substantial military nexus, the absence of any connection to the military here places this appointment outside the scope of statutory authorization.

It is undisputed that the Attorney General has a general grant of power to appoint SAUSAs to "assist United States attorneys when the public interest so requires," 28 U.S.C. § 543, and that lawfully appointed SAUSAs may generally participate in legal proceedings to which they are assigned. 28 U.S.C. § 515. However, this general DOJ authority is not an "express" exception specifically

---

(identifying roughly 23,000 federal employees currently serving as attorneys in the 0905 General Attorney Series outside of the Department of Defense and Department of Justice).

[7] Mark Hertling, *JAGs Shouldn't Be Civilian Prosecutors*, The Bulwark (Feb. 10, 2026), https://www.thebulwark.com/p/jags-shouldnt-be-civilian-prosecutors.

removing JAGs from the reach of the Posse Comitatus Act because it applies to *all* lawyers appointed to serve as SAUSAs regardless of their full-time employment.

Further, these general provisions cannot be read in isolation. They must be construed in light of the more specific restrictions in 10 U.S.C. § 973(b), which prohibits an active-duty military officer from holding or exercising the functions of certain civil offices to "ensure civilian preeminence in government." *Ortiz v. United States*, 585 U.S. 427, 433 (2018). This provision sought to "prevent the military establishment from insinuating itself into the civil branch of government and thereby growing 'paramount' to it." *Riddle v. Warner*, 522 F.2d 882, 884 (9th Cir. 1975) (citing Cong. Globe, 41st Cong. 2d Sess. App. 150 (1870)). For example, in discussing the function of the provision, one Congressman expressed his fear "that all Army officers may be detailed to fill civil positions when a civil officer could not be detailed to fill a military position; hence the military will grow to be paramount to the civil, instead of the civil being paramount to the military." *See* Cong. Globe, 41st Cong., 2d Sess. App. 150 (1870).[8]

In 1983, OLC reviewed the practice of active-duty JAGs serving as SAUSAs and prosecuting petty offenses committed by civilians on military

---

[8] *See also* Memorandum from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (OLC), to William P. Tyson, Director, Executive Office for United States Attorneys, *Re: Applicability of 10 U.S.C. § 973(b) to JAG Officers Assigned to Prosecute Petty Offenses Committed on Military Reservations* ("1983 OLC Memo"), https://www.justice.gov/olc/page/file/965131/dl?inline=.

installations. *See* 1983 OLC Memo at 1-5. OLC concluded that absent a specific statutory exception, this practice violated the general prohibition set forth in 10 U.S.C. § 973(b). *Id.* at 30–31. OLC noted that when Congress had previously legislated exceptions to § 973(b), it permitted "military officers to work in civilian agencies engaged in activities with some military nexus." *Id.* at 16. OLC concluded that "unless and until Congress takes some action which would specifically permit the practice of using regular military officers to prosecute civil offenses *committed on military bases,* regular JAG officers may no longer be authorized by this Department to perform the duties in question." *Id.* at 31–32 (emphasis added).

In response, Congress promptly amended 10 U.S.C. § 973(b) to create § 973(b)(2)(B), which permits military officers to "hold or exercise the functions of" certain civil offices in the federal government "when assigned or detailed to that office or to perform those functions." *See* Pub. L. No. 98-94, Tit. X, Pt. A, § 1002, 97 Stat. 614, 655–656 (1983 Amendment). The accompanying House Conference Report stated that the amendment permitted JAG Corps personnel to continue assisting DOJ attorneys "with cases related to military installations and other military matters." *See* H.R. Conf. Rep. 98-352, reprinted in 1983 U.S.C.C.A.N. 1160 ("House Report"), at 233. But the House Report stressed that "[t]he clarification is *not intended to encourage substitution of military officers for civilian personnel in areas unrelated to the military.*" *Id.* (emphasis added).

The Senate Report accompanying the legislation echoed these limitations. *See* S. Rep. No. 98-174 (1983), reprinted in 1983 U.S.C.C.A.N. 1081 ("Senate Report"). The Senate Report recited the historical practice of using JAGs as SAUSAs to prosecute "petty offenses committed on military installations" and in civil cases where the military "is the primary plaintiff or defendant and the special expertise of a military officer-attorney is vital." *Id.* at 232–33. The Senate Report noted that the 1983 OLC Memo recommended that this "longstanding and successful practice" continue, and thus, the Senate Report confirmed that the amendment to 10 U.S.C. § 973(b) simply adopted "the interpretation having previously been given by the Executive Branch to the existing section." *Id.* at 233. Much like the House Report, the Senate Report stressed that "this provision *does not sanction or endorse any use of military attorneys beyond that permitted under that interpretation*." *Id.* (emphasis added).

Several years later, Congress amended 10 U.S.C. § 806 to clarify that JAG officers serving as SAUSAs under the revised 1983 law did not violate the UCMJ. *See* Pub. L. No. 99–661, Tit. VIII, § 807, 100 Stat. 3909 (1986). The amended provision stated that "[a] judge advocate who is assigned or detailed to perform the functions of a civil office in the Government of the United States under section 973(b)(2)(B) of this title may perform such duties as may be requested by the agency concerned, including representation of the United States in civil and

criminal cases." 10 U.S.C. § 806(e)(1). Like the other statutory provisions discussed above, this amendment is not an "express[]" exception to the Posse Comitatus Act. It references neither that statute, civilian prosecution, civilian arrests, nor the execution of civilian laws. Rather, it simply ensures alignment between the UCMJ and § 973(b), which–as discussed at length above–only authorizes JAG officers to participate in prosecutions with a military nexus.

*     *     *

Congress *never* authorized JAG officers to be general criminal prosecutors in civilian courtrooms. Read together, the relevant statutory provisions do not authorize a JAG officer to prosecute a civilian for an offense lacking a nexus to the military. Even if that were a permissible interpretation, this court may only recognize exceptions to the Posse Comitatus Act "expressly authorized" by Congress. 18 U.S.C. § 1385. The government's novel position here fails to meet that high standard.

Rather, this prosecution is a stark departure from the longstanding limits on when and how JAG officers may lawfully participate in criminal prosecutions involving civilians. The government's principal case featured a prosecution by an Air Force JAG officer of a defense contractor arising from its sale of aircraft parts to an Air Force base. *United States v. Allred*, 867 F.2d 856, 859 (5th Cir. 1989); *see* Gov't Resp. at 3–5. *Allred* simply reaffirms an uncontested point: a JAG may

lawfully participate in criminal proceedings with a clear and substantial connection to the military. Other cases cited by the government involve civilian attorneys and therefore do not implicate the Posse Comitatus Act (or its exceptions). *E.g.*, *United States v. Wrigley*, 520 F.2d 362 (8th Cir. 1975); *United States v. Agrusa*, 520 F.2d 370 (8th Cir. 1975); Gov't Resp. at 5.

## III. The government also violated binding Army regulations that explicitly limit JAG participation to prosecutions with a military "interest."

There is an independent reason, separate from the aforementioned Posse Comitatus Act issues, that warrants granting Mr. Johnson's motion: government counsel's prosecution of this case plainly violates the applicable Army regulations which must be satisfied for an Army JAG to lawfully serve as a SAUSA. Those regulations–32 C.F.R. § 516.4 and Army Regulation (AR) 27-10–explicitly limit such appointments to cases in which "the Army has an interest." Absent any such interest here, the appointment is *ultra vires*.

In 1994, the Army promulgated 32 C.F.R. § 516.4, which delineates the responsibilities between the Army JAG Corps and the DOJ. Notably, 32 C.F.R. § 516.4(e)(1–3) establishes that Army JAGs, "when appointed as SAUSAs under 28 U.S.C. 543, will represent the Army's interests in either criminal or civil matters in Federal Court" in the following manner:

(1) Felony and misdemeanor prosecutions in Federal court. Army attorneys, at the installation level, after being duly appointed (See AR 27-10), will prosecute cases, *in which the Army has an interest*, in Federal court. Army attorneys who prosecute criminal cases will not represent the United States in civil litigation without authorization from Chief, Litigation Division.

(2) SAUSAs for civil litigation. By assignment of TJAG and upon the approval of the U.S. Attorney, Judge Advocates will serve within a U.S. Attorney's office to represent the government in litigation *in which the Army or DOD has an interest*. These Judge Advocates have the same general authority and responsibility as an Assistant U.S. Attorney.

(3) Special Attorneys assigned to DOJ. By assignment of TJAG and with the concurrence of the appropriate DOJ official, Judge Advocates will work as Special Attorneys for DOJ. Special Attorneys are authorized to represent the United States in civil litigation *in which the Army or DOD has an interest*. (emphasis added)

By defining the scope of their prosecutorial authority to cases "in which the Army has an interest," this regulation prohibits Army JAGs from acting as SAUSAs for civilian offenses that lack a military nexus. Moreover, this regulation is not an internal policy document—it is a binding rule promulgated by the U.S. Army, published in the Federal Register, and using mandatory language to establish procedural and jurisdictional restraints. Under the *Accardi* principle, which states that federal agencies must obey the rules they promulgate, the Army must obey 32 C.F.R. § 516.4. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954).

Further, 32 C.F.R. § 516.4(e)(1) cites AR 27-10, *Military Justice* (8 January 2025), the regulation governing the administration of military justice in the Army. Much like 32 C.F.R. § 516.4, AR 27-10 requires a military nexus for any case in which an Army JAG serves as a SAUSA.

For instance, Chapter 23 of AR 27-10 applies to "prosecutions in U.S. District Court before either a district judge or a magistrate judge for violations of Federal law committed on Army installations or violations that involve Army interests or property." *Id*. ¶ 23-1(a). An Army JAG may serve as a SAUSA "pursuant to 28 USC 543 to prosecute crimes in which the Army has an interest." *Id*. ¶ 23-4(a). For felonies, Army JAGs are appointed as SAUSAs to "prosecute offenses in which the Army has an interest." *Id.* ¶ 23-3(a). For misdemeanors, Army JAGs appointed as SAUSAs may represent the government before a magistrate judge in cases where someone commits a misdemeanor or infraction "on a military installation or on Federal property . . . ." *Id*. ¶ 23-5(a).

By confining the scope of federal court prosecutions to crimes committed on military bases or offenses involving an "Army interest," AR 27-10 prohibits the detailing of Army JAGs as SAUSAs to act as general civilian prosecutors. The Navy and Air Force impose similar restrictions on their JAGs.[9] These service

---

[9] For instance, Naval Legal Service Command Instruction 5822.1, ¶ 4, states that the Navy provides support to U.S. Attorneys offices prosecuting matters "wherein the [Navy] is the originating agency or in which the [Navy] has a significant

regulations reflect a common theme: JAGs may only prosecute a case as a SAUSA when there is an articulable military nexus, usually demonstrated when the alleged crime occurred on a military installation, involved military property, or in which the military service was the originating or lead investigative agency.

Given that there is no military nexus in this prosecution, government counsel's participation violates 32 C.F.R. § 516.4 and AR 27-10, and is thus *ultra vires*. The Army's authority to provide a JAG for SAUSA appointment derives from 32 C.F.R. § 516.4. Because the Army has no interest in this case, it has no regulatory authority to be involved. Notwithstanding the Attorney General's general power to appoint special attorneys, 28 U.S.C. § 543 cannot sustain an attorney appointed in violation of his own agency's regulations, nor can the "public interest so require" a SAUSA acting *ultra vires*. Removal of government counsel from this case is not just appropriate, but necessary.

---

interest." Similarly, Air Force Policy Directive 51-2, *Military Justice And Other Criminal Proceedings* (16 January 2024), states the Air Force will support "the prosecution in U.S. district courts or federal magistrate courts of civilians who commit offenses in violation of federal law, including applicable assimilated state criminal laws, on [Air Force] installations where the United States has either exclusive or concurrent jurisdiction." ¶ 2.16.2.

## **CONCLUSION**

Drawing inspiration from our nation's founding, the Posse Comitatus Act and 10 U.S.C. § 973(b) have long stood as bulwarks against military intrusion into and subordination of civilian legal affairs. By assigning a JAG to prosecute a civilian offense completely devoid of a military nexus, the government has crossed a perilous line – a clear line drawn by Congress and memorialized in the Army's own regulations. *Amici* therefore respectfully request that this Court grant Mr. Johnson's motion to strike the appearance of government counsel.

Respectfully submitted,

Dated: March 10, 2026

Zachary T. West*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 163
Washington, DC 20006
Tel: (202) 579-4582
Fax: (202) 769-3176
zachary.west@protectdemocracy.org

Beau C. Tremitiere*
PROTECT DEMOCRACY PROJECT
300 Center Ave, Suite G-251
Superior, CO 80027
Tel: (202) 579-4582
Fax: (202) 769-3176
beau.tremitiere@protectdemocracy.org

*Counsel for Amici Curiae*

/s/ John R. Marti
John R. Marti
   *Counsel of Record*
Dorsey & Whitney LLP
50 South 6th St, Suite 1500
Minneapolis, MN 55402
Tel: (612) 492-6775
Fax: (612) 677-3265
marti.john@dorsey.com

*Motions for admission Pro Hac Vice forthcoming*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Local Rule 7.1(f) because it contains 4450 words, as determined by the Word Count function of Microsoft Word. It also complies with the typeface and type-style requirements of Local Rule 7.1(h) because it was prepared with Microsoft Word and uses 14-point proportionately spaced Times New Roman font.

Dated: March 10, 2026                                          /s/ John R. Marti

**Eugene R. Fidell** served as a judge advocate in the U.S. Coast Guard. He is a co-author of the casebook Military Justice Cases and Materials (4th ed. 2023). He has taught military justice at Yale, Harvard, the University of Virginia, New York University, and American University and is currently a Visiting Lecturer in Law at Yale Law School. He co-founded the National Institute of Military Justice and edits the Global Military Justice Reform blog. He is admitted to practice in Massachusetts, Connecticut, the District of Columbia, and New York.

**B. Todd Jones** is a former Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives and a two-time U.S. Attorney for the District of Minnesota. He served for fourteen years in the U.S. Marine Corps on both active duty and in the reserves, serving as an infantry officer before transitioning into the role of a judge advocate, where he acted as both a trial defense counsel and a prosecutor in court-martial proceedings. After his active duty military service, he joined the Department of Justice, serving as an Assistant U.S. Attorney and eventually holding the post of U.S. Attorney for the District of Minnesota under two different presidential administrations.

**Charles Kovats** served in the Department of Justice for twenty years, including fifteen in the District of Minnesota where he served as an AUSA, Criminal Division Chief, and Acting U.S. Attorney. He started his DOJ career as an AUSA in the Central District of California where he worked from 2005–2010 and ended his career with DOJ's National Security Division (2024–2025). He also served for twenty-eight years in the United States Army, including more than twenty years in the Judge Advocate General's Corps, both on active duty and as a member of the reserves. During his service with the Army, he was deployed on three occasions.

**Jason Lien** is a veteran of the U.S. Navy and served on active duty from 1998 to 2002 in the U.S. Navy Judge Advocate General's Corps. Jason was stationed at the Navy Legal Service Office Central at Naval Air Station Pensacola, Florida, where he represented Sailors, Marines and Coast Guard personnel in courts-martial and administrative hearings. While on active duty, he also served as appellate counsel representing the U.S. Navy before the Navy-Marine Court of Criminal Appeals and Court of Appeals for the Armed Forces. After he left active duty in 2002, Jason

---

[10] Affiliations in the subsequent biographies are shown for identification purposes only.

served for a number of years in the active reserves with Navy Judge Advocate General Corps while he practiced law at Maslon LLP, where he is a partner today.

**Major General Steven J. Lepper, U.S. Air Force (Ret.)**, served for 35 years in the United States Air Force as a judge advocate in a variety of roles including Deputy Legal Counsel to the Chairman of the Joint Chiefs of Staff, commander, and military judge. He culminated his service as Deputy Judge Advocate General of the Air Force.

**John Marti** served for 21 years in the U.S. Marine Corps as an infantry officer and judge advocate. During one assignment he was appointed as Special Assistant U.S. Attorney prosecuting offenses with a connection to a Marine Corps base. He also served as a federal prosecutor for 18 years, including for a time as acting U.S. Attorney for the District of Minnesota.

**Lieutenant Colonel Daniel Maurer, U.S. Army (Ret.)**, served as a judge advocate prosecutor, appellate counsel, an installation's chief of military justice supervising seven prosecutors and support staff, a combat-deployed brigade's senior counsel, strategist for the Army's Chief of Staff, chief of operational law for a contingency command headquarters in Italy, Assistant Professor at the U.S. Military Academy, and Associate Professor at the U.S. Army Judge Advocate General's Legal Center and School. He is currently an Associate Professor of Law at Ohio Northern University's Pettit College of Law, and is author of numerous scholarly works on civil-military relations and military justice. He is on the Board of Directors of the National Institute of Military Justice.

**Rear Admiral James E. McPherson, U.S. Navy (Ret.)**, served as the Acting Secretary of the Navy, Under Secretary of the Army, and General Counsel for the Army under President Donald Trump. He retired as a Rear Admiral in the U.S. Navy after several decades of service, including time as Judge Advocate General of the Navy under President George W. Bush.

**Steven L. Schleicher** served as an AUSA in the District of Minnesota from 2003–2017, prosecuting cases involving violent crime, organized crime and drug trafficking. Prior to that, he spent three years as an Assistant Minnesota Attorney General prosecuting homicides and complex narcotics cases and five years as an Assistant Winona County Attorney. In private practice, Mr. Schleicher served as a Special Assistant Minnesota Attorney General and was trial counsel in the prosecution of Derek Chauvin for the murder of George Floyd. Mr. Schleicher served in the U.S. Army Reserve JAG Corps from 2001–2010, including a one-

year active deployment to Heidelberg, Germany in 2006 in support of Operation Iraqi Freedom.

**Hank Shea** is a Senior Distinguished Fellow at the University of St. Thomas School of Law, where he has taught for eighteen years. He previously served as an Assistant U.S. Attorney in the District of Minnesota for twenty years. Earlier in his career, Mr. Shea also served four years of active duty as an Assistant to the Army General Counsel in the Pentagon and then seven years as a Reserve Officer in the Army's Judge Advocate General Corps in the same office.

**Andrew Winter** retired from the US Attorney's Office for the District of Minnesota in 2025 after working as an AUSA for 23 years, prosecuting cases involving national security, cybercrime, and organized crime. Prior to that, he spent ten years as an Assistant Hennepin County Attorney prosecuting violent and general crimes. Mr. Winter served in the U.S. Army Reserve JAG Corps from 2001–2014, including a deployment to Baghdad, Iraq from 2009–2010 in support of Operation Iraqi Freedom.