# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | |
| *Plaintiff,* | Case No.: 0:26-MJ-00081-KMM-SGE |
| v. | **BRIEF OF *AMICI CURIAE* FORMER U.S. MILITARY LAWYERS IN SUPPORT OF DEFENDANT'S OBJECTIONS TO THE ORDER DENYING THE MOTION TO STRIKE** |
| Paul E. Johnson | |
| *Defendant.* | |

Zachary T. West
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 163
Washington, DC 20006
Tel: (202) 579-4582
Fax: (202) 769-3176
zachary.west@protectdemocracy.org

Beau C. Tremitiere
PROTECT DEMOCRACY PROJECT
300 Center Ave, Suite G-251
Superior, CO 80027
Tel: (202) 579-4582
Fax: (202) 769-3176
beau.tremitiere@protectdemocracy.org

*Counsel for Amici Curiae*

John R. Marti
   *Counsel of Record*
Dorsey & Whitney LLP
50 South 6th St, Suite 1500
Minneapolis, MN 55402
Tel: (612) 492-6775
Fax: (612) 677-3265
marti.john@dorsey.com

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI CURIAE.................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT...................................... 2

ARGUMENT .................................................................................................. 3

    I.      The Posse Comitatus Act prohibits a JAG from prosecuting a
            civilian in a case with no military nexus............................................. 3

    II.     This prosecution does not satisfy any exception to the Posse
            Comitatus Act "expressly authorized" by the Constitution or
            federal law.......................................................................................... 9

         A.     Posse Comitatus Act exceptions must specifically authorize
                 military involvement in civilian law enforcement.................. 10

         B.     28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) are not express
                 PCA exceptions. ................................................................... 14

         C.     Congress never authorized JAGs to serve as general-purpose
                 civilian prosecutors.............................................................. 19

    III.    This Court has authority to remedy the government's regulatory
            violations.......................................................................................... 25

CONCLUSION ....................................................................................... 28

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

*Amici* are twenty-seven former judge advocates (JAGs) who served in the Army, Navy, Air Force, Marine Corps, and Coast Guard, advising commanders on administrative, criminal, regulatory, and international law, in addition to serving as military judges, prosecutors, defense counsel, JAG School instructors and service academy professors, and legal assistance attorneys supporting servicemembers and their families. During their military service, some *amici* were appointed as Special Assistant U.S. Attorneys (SAUSAs) and detailed to the Department of Justice (DOJ) to handle matters with a clear and substantial nexus to military affairs. Some *amici* also served in the DOJ as full-time federal prosecutors after completing their military service. Some *amici* teach law at civilian law schools. *Amici* therefore possess a unique professional, personal, and scholarly understanding of the military and civilian criminal justice systems, the distinct constitutional values each advances, and the limited circumstances in which they can lawfully overlap. *Amici* are identified in the Appendix.

*Amici* submit this brief to ensure that the perspective of experienced former military legal professionals is represented before this Court. They have a profound

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* contributed money to fund this brief's preparation or submission.

1

interest in preserving the bedrock constitutional principle of civilian control of the military, safeguarding independent civilian prosecutorial discretion, maintaining the vital boundaries of the Posse Comitatus Act (PCA), and thereby protecting and promoting the rule of law. They are deeply concerned that deploying JAGs to prosecute civilians in federal court in cases that lack a substantial military nexus erodes vital democratic norms, harms military readiness, and unlawfully inserts the military into civilian law enforcement's core functions.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, the government has detailed JAGs as SAUSAs to prosecute offenses committed by civilians on military installations—cases with a clear military interest. But the government has recently expanded this practice far beyond its historical and statutory bounds, detailing JAGs to fill vacancies left by career DOJ lawyers and to prosecute civilians for offenses with no military connection. That is happening here, where the sole government counsel, an Army JAG officer, is prosecuting a civilian for an alleged crime unrelated to the military.

Mr. Johnson moved to strike government counsel's appearance, and before the magistrate judge, *amici* explained why detailing a JAG officer to prosecute a civilian in a case without military nexus violates the PCA and binding Army regulations. (ECF No. 39). The magistrate judge denied the motion to strike, finding that while government counsel's appointment violates Army regulations

2

limiting JAG participation as SAUSAs to cases "in which the Army has an interest," she lacked authority to remedy the violation. *See* Order at 12–13 (ECF No. 61). The magistrate judge also found that 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) are express PCA exceptions because they authorize JAGs to serve as SAUSAs without limitation. Order at 3–10.

Below, *amici* explain why it is unlawful for JAGs to prosecute civilians in cases with no military nexus and why the magistrate judge erred by denying Mr. Johnson's motion to strike. First, using JAGs to prosecute civilians in cases without a substantial military nexus violates the PCA, which reflects the "traditional and strong resistance of Americans to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Second, neither the Constitution nor any federal statute "expressly" authorizes this practice as an exception to the PCA. Third, the government's violation of its own binding regulations demands a remedy, and this Court has the authority to provide one.

## ARGUMENT

I. **The Posse Comitatus Act prohibits a JAG from prosecuting a civilian in a case with no military nexus.**

The American tradition of separating the military from civilian law enforcement is foundational to our Republic. The Supreme Court "has long recognized that the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743 (1974). The PCA was born of

3

this tradition. Enacted to end the military's use for domestic law enforcement after the Civil War, the PCA prohibits the willful use of any federal military personnel "to execute the laws" unless "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Federal courts have applied three tests to decide whether the government has violated the PCA:

- The *Red Feather* test—was the military involvement in civilian law enforcement "direct" and "active?" *United States v. Red Feather*, 392 F. Supp. 916, 922–25 (D.S.D. 1975) (explaining "direct active use" includes making arrests, seizing evidence, and interviewing witnesses).

- The *Jaramillo* test—did the military involvement in question pervade the civilian law enforcement activities? *United States v. Jaramillo*, 380 F. Supp. 1375, 1379–81 (D. Neb. 1974) (finding a reasonable doubt whether federal authorities were lawfully engaged when military personnel counseled civilian law enforcement on use of force decisions, advised on negotiations, and dictated defensive restrictions).

- The *McArthur* test—was the use of the military in civilian law enforcement regulatory, proscriptive, or compulsory in nature over civilians? *United States v. McArthur*, 419 F. Supp. 186, 194 (D.N.D. 1975); *see also United States v. Yunis*, 681 F. Supp. 891, 895–96 (D.D.C. 1988) (explaining that "regulatory" power "controls or directs," "proscriptive" power "prohibits or condemns," and "compulsory" power "exerts some coercive force").

The Eighth Circuit later held that the "mere threat of some future injury" is insufficient, refining the *McArthur* test to ask if military involvement in civilian law enforcement "actually regulates, forbids, or compels some conduct on the part of those claiming relief." *Bissonette v. Haig*, 776 F.2d 1384, 1390 (8th Cir. 1985).

Here, the government is violating the PCA under each test by detailing a JAG officer to prosecute Mr. Johnson. A JAG officer prosecuting a civilian exercises direct and active military involvement in civil law enforcement by controlling material aspects of a criminal case. That officer's role pervades civilian law enforcement far beyond the "advice" given in *Jaramillo*, 380 F. Supp. at 1381. Finally, that officer exercises "regulatory" power by deciding whether to initiate a case and what charges to file; "proscriptive" power by bringing the federal government's weight to condemn a defendant; and "compulsory" power by exerting coercive force to secure a conviction and expose the defendant to punishment.[2]

This case fundamentally differs from the routine military-nexus cases where *amici* and other JAG officers have lawfully served as SAUSAs. In those cases, the government did not violate the PCA because such prosecutions advanced a military purpose. This principle, the Military Purpose Doctrine, establishes that "the Act

---

[2] That analysis does not change because the JAG officer is detailed to the DOJ under a civilian supervisor. A JAG officer detailed as a SAUSA remains subject to military control, including an obligation to obey lawful orders under the Uniform Code of Military Justice (UCMJ), a military chain of command that controls their performance evaluations and career trajectory, and military professional responsibility rules. The military can also terminate or alter the detail at any time— as happened here when the prior government counsel, also an Army JAG, "was ordered to return to Memphis to work for the U.S. Attorney's Office there." Order at 2. The government cannot avoid the PCA by routing a military member's day-to-day supervision through a DOJ civilian.

5

does not apply when an independent military purpose justifies the conduct of the military personnel involved in law enforcement activities." *See* Brian L. Porto, Annotation, *Construction and Application of Posse Comitatus Act,* 141 A.L.R. Fed. 271 § 5[b] (1997); *see also* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 49–54 (Nov. 6, 2018) ("The Armed Forces, when in performance of their military responsibilities, are beyond the reach of [the PCA] and its statutory and regulatory supplements.").[3]

Department of Defense (DOD) Instruction 3025.21, *Defense Support of Civilian Law Enforcement Agencies* (Feb. 8, 2019), implements the Military Purpose Doctrine by authorizing direct assistance to civilian law enforcement when those actions are "taken for the primary purpose of furthering a [DOD] or foreign affairs function of the United States, regardless of incidental benefits to civil authorities." *Id.* enclosure 3, ¶ 1.b.(1). Permissible assistance includes "[i]nvestigations and other actions related to a commander's inherent authority to maintain law and order on a [DOD] installation or facility." *Id.* ¶ 1.b.(1).(c).

---

[3] Military involvement in civilian law enforcement does not violate the PCA when an independent military purpose justifies the conduct. *See, e.g.*, *Perales-Muñoz v. United States*, 151 F.4th 1, 8 (1st Cir. 2025) (no PCA violation in Army investigation of a civilian defendant for recruiting fraud because an independent military purpose supported the investigation); *United States v. Chon*, 210 F.3d 990, 994 (9th Cir. 2000) (Navy investigators had "an independent military purpose for their investigation" of civilians: "the protection of military equipment").

6

Service regulations governing when a JAG may serve as a SAUSA likewise reflect the Military Purpose Doctrine. Army regulations limit SAUSA appointments for misdemeanor prosecutions to cases in which "the Army has an interest," 32 C.F.R. § 516.4(e)(1), or offenses committed "on a military installation or on Federal property . . . ." U.S. Dep't of Army, Regul. 27-10, *Military Justice* ¶ 23-5(a) (Jan. 8, 2025) (hereinafter AR 27-10). The Navy and Air Force impose similar restrictions.[4] As discussed in Section II.C., these regulations accord with Congress's view that JAGs may lawfully serve as SAUSAs in cases furthering a military purpose. But assigning JAG officers to prosecute off-base, general civilian crimes lacks that necessary military nexus. Divorced from a military purpose, such prosecutions violate the PCA and manifest the danger Congress sought to avoid: military personnel replacing civilian law enforcement.

Here, the absence of a military nexus is undisputed. The government conceded that "[t]here are no facts in this case involving military personnel," Gov't

---

[4] The Navy provides support to U.S. Attorneys' offices prosecuting matters "wherein the [Navy] is the originating agency or in which the [Navy] has a significant interest." U.S. Dep't of Navy, Commander, Naval Legal Serv. Command Instr. 5822.1, *Naval Legal Service Command Support to U.S. Attorney's Office Prosecution in Federal Magistrate Court* ¶ 4 (July 22, 2025). Similarly, the Air Force supports "the prosecution in U.S. district courts or federal magistrate courts of civilians who commit offenses in violation of federal law . . . on [Air Force] installations where the United States has either exclusive or concurrent jurisdiction." U.S. Dep't of Air Force, Dir. 51-2, *Military Justice and Other Criminal Proceedings* ¶ 2.16.2 (Jan. 16, 2024).

Resp. at 7 (ECF No. 35), and waived any argument concerning an Army interest. The magistrate judge found "it is undisputed that the Army has no interest in the prosecution of Mr. Johnson." Order at 12. Thus, this case falls outside the Military Purpose Doctrine and violates the PCA.

The costs of using JAGs as general civilian prosecutors are serious. Substituting civilian attorneys with military attorneys bypasses the democratic safeguard of prosecutorial discretion. When civilian prosecutors are instructed by their superiors to pursue legally flawed or ethically suspect cases, they can resign. But JAGs cannot—they must obey their military superior's lawful orders on pain of prosecution under the UCMJ or other adverse administrative consequences.[5]

Detailing JAGs to prosecute domestic civilian crimes also diverts them from their military duties—a concern the DOD itself recently articulated. In March 2026, the Secretary of Defense announced a review of DOD legal functions, explaining that its current structure had "pulled critical judge advocates away from what matters most: advising commanders in the fight, on operations [and] in deployed environments." His direction: "align functions so that military legal support remains 'laser-focused' on warfighting and readiness" and let "civilian

---

[5] *See* 10 U.S.C. §§ 890, 892 (UCMJ offenses of willfully disobeying a superior commissioned officer and failure to obey an order or regulation).

lawyers handle nonoperational assignments . . . [and] litigation outside of military channels."[6] We agree.

## II.    This prosecution does not satisfy any exception to the Posse Comitatus Act "expressly authorized" by the Constitution or federal law.

The government's detailing of a JAG officer to this case is a *prima facie* PCA violation. Thus, the next question is whether an express constitutional or statutory exception applies. The answer is no. The magistrate judge found that 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) "operate" as express PCA exceptions because their text authorizes JAGs to be appointed as SAUSAs "without limitation." Order at 8, 10. That was error because the magistrate judge inferred an implied exception when the PCA demands an express one: the text of neither statute specifically authorizes military involvement in civilian law enforcement.

The magistrate judge also erred by finding the statutory text unambiguous and failing to consider Congress's clear intent that it was not authorizing JAGs to serve as general civilian prosecutors. *Id.* at 5. The question is not whether these statutes authorize JAG appointments, but whether they are *express* PCA exceptions. The legislative history proves they are not. Finally, the magistrate's ruling allows the government to replace civilian prosecutors with military lawyers,

---

[6] Matthew Olay, *Hegseth Calls for Assessment, Alignment of DOW Legal Functions, Operations*, U.S. Dep't of War (Mar. 11, 2026), https://perma.cc/5BS2-XRV6.

9

a result anathema to Congress's concerns about military encroachment into civilian office and thus "demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (quotation omitted).

### A.   Posse Comitatus Act exceptions must specifically authorize military involvement in civilian law enforcement.

The PCA's use of the word "expressly" reflects Congress's choice to prohibit military involvement in civil law enforcement unless Congress specifically allows it. During the PCA's passage, the House manager included the word "expressly" to prevent any possibility "that the Army might be used in all cases where implied authority might be inferred," noting that this "single word" restores "to this bill the principle for which we have contended so long, and which is so vital to secure the rights and liberties of the people."[7] In 1878, as is true today, "expressly" meant "[i]n an express manner," "in direct terms," or "plainly." Noah Webster, *A Dictionary of the English Language* 156 (1878 ed.).

Congress has since elaborated on the express authorization requirement, stating in a report for the Military Cooperation with Civilian Law Enforcement Agencies Act that "[c]ertain military activities, although otherwise prohibited by the [PCA], are permissible if expressly authorized by statute. These permissible military actions *are specifically defined* and are generally restricted to instances

---

[7] 7 Cong. Rec. 4686 (1878) (remarks of Rep. Hewitt); Elsea, R42659, *supra*, at 29 n.218.

involving civil disorders . . . disasters . . . and threats to Federal property." H.R. Rep. No. 97-71 pt. 2, at 6 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 1785, 1789 (emphasis added). Given the "historical and policy considerations behind the [PCA]," a statute purporting to serve as a PCA exception must "be construed narrowly." *See id.* at 12.

Among recognized PCA exceptions, Congress has expressly authorized the military to execute the law in three ways: (1) giving a military service civilian law enforcement authority, like vesting the Coast Guard with such duties; (2) establishing general rules for certain types of assistance, like permitting the military to support civilian police by sharing information, loaning equipment, or providing training; and (3) addressing individual cases and circumstances "with more narrowly crafted legislation," like the Insurrection Act (10 U.S.C. §§ 251–255). *See* Elsea, R42659, *supra*, at 31 n.224 (collecting statutory PCA exceptions).

The following statutes—each a recognized PCA exception authorizing the DOD to provide military assistance to the DOJ and Federal Bureau of Investigation (FBI)—illustrate what an express authorization looks like:

- 18 U.S.C. §§ 112, 1116, and 1201: "the Attorney General may request assistance from any Federal, State, or local agency, including the Army, Navy, and Air Force, any statute, rule, or regulation to the contrary[,] notwithstanding" to protect foreign officials and internationally protected persons from assault, manslaughter, murder, and kidnapping.

11

- 10 U.S.C. § 282(a): in emergency situations involving weapons of mass destruction, "[t]he Secretary of Defense, upon the request of the Attorney General, may provide assistance in support of [DOJ] activities," "including personnel of the [DOD]" if the Secretary of Defense and Attorney General jointly determine an emergency exists and such assistance will not harm military preparedness.

- 10 U.S.C. § 283(a): "Upon the request of the Attorney General, the Secretary of Defense may provide assistance in support of [DOJ] activities" related to bombings of government facilities and places of public use.

- 18 U.S.C. §§ 351(g), 1751(i): in FBI investigations of the assassination, kidnapping, or assault of the President or a Member of Congress, "[a]ssistance may be requested from any Federal, State, or local agency, including the Army, Navy, and Air Force, any statute, rule, or regulation to the contrary notwithstanding."

- 18 U.S.C. § 831(e), (f): regarding criminal transactions in nuclear materials, "[t]he Attorney General may request assistance from the Secretary of Defense . . . and the Secretary of Defense may provide such assistance . . . except that the Secretary of Defense may provide such assistance through any [DOD] personnel." "Notwithstanding section 1385 of this title, the Secretary of Defense may, in accordance with other applicable law, provide such assistance to the Attorney General . . . ."

The legislative history for these provisions also illustrates how Congress enacts a PCA exception. For example, when Congress enacted 18 U.S.C. § 831, an accompanying House report stated a provision "sets forth an exception to the 'Posse Comitatus' prohibition . . . The Committee is fully aware that exceptions to the 'Posse Comitatus' prohibition involving military personnel as participants in civilian law enforcement activities must be narrow and should be authorized only

when absolutely necessary." H.R. Rep. No. 97-624, at 10–11 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 3229, 3238–39.[8]

These recognized PCA exceptions share common elements: (1) they define permissible military actions, citing assistance provided by a military service or the Secretary of Defense; (2) they involve a civilian cabinet official or agency requesting assistance from the DOD; (3) they include language recognizing the PCA's reach and negating its application in the specific, enumerated context; (4) they have legislative history identifying them as express PCA exceptions; and (5) they are narrowly tailored. *See Newsom v. Trump*, 797 F. Supp. 3d 1092, 1116 (N.D. Cal. 2025) ("[A] close look at the recognized statutory exceptions to the [PCA]" reveal many "apply only in very specific circumstances," "are narrow," and "do not undermine the whole act."). Together, these statutes illustrate the "more commonly accepted proposition" that "the phrase 'in cases and under circumstances expressly authorized by . . . Act of Congress' demands that the statutory exception *specifically refer to some form of military assistance*." *See* Elsea, R42659, *supra*, at 34 (emphasis added).

---

[8] Other Congressional reports have identified statutory provisions as express PCA exceptions. *See, e.g.*, H.R. Rep. No. 97-71 pt. 2, at 12 ("Proposed section 375 represents a modest and conditional departure from the current strictures of the Posse Comitatus Act."); S. Rep. No. 95-1071, at 37 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2676, 2712 (identifying a section that "exempts [DOD Inspector General audits and investigations] from the Posse Comitatus Act (18 U.S.C. 1385).")

**B.    28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) are not express PCA exceptions.**

Measured against these standards, neither 28 U.S.C. § 543 nor 10 U.S.C. § 806(e)(1) is an express PCA exception. Neither statute specifically authorizes the armed forces to engage in civilian law enforcement or negates the PCA's reach. Instead, they are housekeeping provisions permitting JAG officers to serve as SAUSAs consistent with the Military Purpose Doctrine. The PCA's express authorization requirement is a high bar, and the magistrate judge's ruling that these statutes are *implied* exceptions fails to clear it.

First, 28 U.S.C. § 543 fails every marker of a recognized PCA exception. It states the "Attorney General may appoint attorneys to assist United States attorneys when the public interest so requires," but does not reference a military service, the Secretary of Defense, or the PCA. There is also no evidence Congress enacted § 543 as a PCA exception, and DOD regulations have not identified it as one. *See* H.R. Rep. No. 97-71 at 6–7 (Section 543 is not listed among PCA exceptions); DOD Instruction 3025.21, *supra*, encl. 3, ¶ 1.b.(5) (same); *see also Newsom*, 797 F. Supp. 3d at 1114 (reasoning a statute was not a PCA exception because DOD had not identified it as such in DOD publications). Given that PCA exceptions must "be construed narrowly" and "authorized only when absolutely necessary," 28 U.S.C. § 543 cannot be an express PCA exception when it does not mention the military. H.R. Rep. No. 97-71 at 12; H.R. Rep. No. 97-624 at 11.

14

The magistrate judge's contrary conclusion rests on analytical error: rather than analyzing whether § 543 expressly authorizes military involvement in civilian law enforcement, she analyzed whether it operates to appoint JAGs as SAUSAs. Even though "the plain language of 28 U.S.C. § 543 does not limit whom the Attorney General may appoint as a SAUSA," Order at 4, the absence of limitation is not express PCA authorization. Because the PCA is a specific criminal prohibition, any express exception to it must unambiguously address the prohibited conduct: military involvement in law enforcement.[9]

Moreover, § 543 was never meant to be an express PCA exception because it does not need to be. Where a military nexus exists, the Military Purpose Doctrine authorizes JAGs to serve as SAUSAs without implicating the PCA. Section 543 does what its text says: it gives the DOJ general authority to appoint various lawyers as SAUSAs. Nothing more.

Second, 10 U.S.C. § 806(e)(1) is not an express PCA exception. That provision states "[a] judge advocate who is assigned or detailed to perform the

---

[9] The magistrate judge noted that for the Anti-Injunction Act, 28 U.S.C. § 2283, the Supreme Court did not require an "expressly authorized" exception to reference the statute it creates an exception to. Order at 6–7 (citing *Mitchum v. Foster*, 407 U.S. 225, 237 (1972)). But many recognized PCA exceptions explicitly reference the PCA or contain language negating its reach. *See, e.g.*, 5 U.S.C. § 408(g) ("The provisions of section 1385 of title 18, shall not apply"); 18 U.S.C. §§ 112, 351(g), 1116, 1201, and 1751(i). Thus, the absence of that reference is highly probative to whether a statute is an express PCA exception.

15

functions of a civil office in the Government of the United States under section

973(b)(2)(B) of this title may perform such duties as may be requested by the

agency concerned, including representation of the United States in civil and

criminal cases." Section 806(e)(1) also bears no resemblance to a recognized PCA

exception: it does not authorize a military service or the Secretary of Defense to

provide law enforcement assistance to civilian authorities or negate the PCA's

reach. Nor has Congress or any DOD regulation identified it as a PCA exception.

Further, no other recognized PCA exception is in the UCMJ, a statute that

governs servicemembers, not the civilian officials whose use of military personnel

the PCA regulates. Other recognized PCA exceptions in Title 10 appear in Chapter

13, the Insurrection Act (10 U.S.C. §§ 251–255) and Chapter 15, governing

military support for civilian law enforcement agencies (10 U.S.C. §§ 271–284).

Congress did not silently embed blanket authorization for JAGs to prosecute

civilians in a statute directed at internal military discipline.

The magistrate judge's contrary conclusion rests on the fact that § 806(e)(1)

"explicitly allows JAG lawyers to 'represent[] . . . the United States in civil and

criminal cases.'" Order at 10. But the magistrate judge conflated two distinct

questions: whether a detail is lawful under the UCMJ, and whether it is lawful

under the PCA. Section 806(e)(1) only answers the first question. A statute that

conditions lawfulness on another provision—here, § 973(b)(2)(B)—cannot itself

16

be an express PCA authorization.[10] Properly understood, § 806(e)(1) clarifies that an otherwise lawful detail allows a JAG officer to represent the government in court. Congress knew how to craft statutory exceptions: it did so in recognized PCA exceptions and in § 973(b)(2)(B), which is an exception to 10 U.S.C. § 973(a)'s general prohibition on active-duty military officers accepting outside employment. Because Congress did not frame § 806(e)(1) as a PCA exception, the PCA's constraints remain in place. Nor was there any need for § 806(e)(1) to be a PCA exception: where a prosecution has a military nexus, the PCA presents no bar.

The two court of appeals cases the magistrate judge cited do not change the analysis. Both involved a clear and substantial military nexus, so the core question here was absent. *See United States v. Silva-Rosa*, 275 F.3d 18, 20 (1st Cir. 2001);[11] *United States v. Allred*, 867 F.2d 856, 858–59 (5th Cir. 1989). In *Allred*, the Fifth Circuit made the same analytical error as the magistrate judge, recognizing *implied*

---

[10] According to the magistrate judge, *amici* argued that Congress authorized JAG officers to lawfully participate in certain prosecutions as SAUSAs, but then also argued that certain statutes were "not 'express' enough" to be PCA exceptions. Order at 6. But *amici's* position—both before the magistrate and here—is that JAGs may serve as SAUSAs in cases with a military nexus without violating the PCA because such prosecutions fall under the Military Purpose Doctrine.

[11] The magistrate judge invoked the separation of powers when discussing *Silva-Rosa*, suggesting that directing the executive branch on whom it can appoint raises weighty concerns. Order at 8. But the PCA is a congressional limitation on Executive Branch use of the military; enforcing it is not judicial overreach. Courts have enforced the PCA, *see Newsom*, 797 F. Supp. 3d 1092, and enforcing a statutory prohibition is not dictating whom the executive branch can appoint.

17

PCA exceptions in §§ 543 and 806(e)(1) despite their silence on military involvement in civil law enforcement. 867 F.2d at 871. Tellingly, no party has cited a case where a JAG served as a SAUSA without a military nexus.

Further, *Allred* is an outlier when compared to other cases where courts have found express PCA exceptions based on explicit references to military involvement in civilian law enforcement. *See, e.g.*, *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1477–78 (11th Cir. 1992) (finding a statute created a PCA exception when it authorized the Coast Guard to perform law enforcement functions); *United States v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995) ("This DEA airlift was specifically authorized by . . . the National Defense Authorization Act"); *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1164 (9th Cir. 2022) (no PCA violation when a statute "expressly authorizes surveillance by the military at the southern border.").

In sum, §§ 543 and 806(e)(1) are not express PCA exceptions. Neither resembles a recognized exception or has been identified as one by Congress or the DOD. Congress does not "hide elephants [e.g., a sweeping grant of authority to use the military for domestic law enforcement] in mouseholes [e.g., one subsection of a procedural statute]." *Newsom*, 797 F. Supp. 3d at 1116 (quotation omitted) (alteration in original). When there is ambiguity whether a statute is an express PCA exception, the PCA's text, purpose, and history demand a court default to

18

finding no express exception. At minimum, that ambiguity obligates a court to consult legislative history before finding one exists.

## C. Congress never authorized JAGs to serve as general-purpose civilian prosecutors.

Legislative history shows that Congress did not enact §§ 543 and 806(e)(1) to permit JAGs to serve as SAUSAs "without limitation," *contra* Order at 8, yet the magistrate judge declined to consider such history. Order at 5, 9. Read against the PCA's broad presumptive application, these provisions do not operate as express PCA exceptions; at minimum, their collective meaning is ambiguous. The magistrate judge's failure to consult legislative history was error, and that history makes clear that her reading cannot stand.

First, the relevant ambiguity is not whether §§ 543 and 806(e)(1) authorize SAUSA appointments, but whether they are express PCA exceptions. In deciding if statutory language is ambiguous, courts refer "to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *LaCurtis v. Express Med. Transporters, Inc.*, 856 F.3d 571, 578 (8th Cir. 2017) (quotation omitted). When a provision is open to multiple reasonable interpretations, it is ambiguous, and courts may examine other sources to discern legislative intent. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 862–63 (8th Cir. 2011).

19

On the question of whether they are express PCA exceptions, §§ 543 and 806(e)(1) are open to multiple reasonable interpretations. Congress knew how to create an unambiguous PCA exception: it authorizes military assistance to civilian law enforcement and invokes the PCA. *See, e.g.*, 5 U.S.C. § 408(g); 18 U.S.C. § 831. But Congress did not do that in §§ 543 and 806(e)(1). A statute that is silent to the categorical prohibition it purportedly displaces cannot unambiguously displace it. Because these provisions are open to multiple interpretations when read alongside the PCA, the magistrate should have consulted legislative history to resolve whether Congress enacted them as express PCA exceptions.

Legislative history proves Congress did not. The legislative history of 10 U.S.C. § 973(b) confirms Congress never intended JAGs to be general civilian prosecutors. This provision bars active-duty military officers from holding or exercising the functions of certain civil offices to "ensure civilian preeminence in government," *Ortiz v. United States*, 585 U.S. 427, 433 (2018), and was passed to "prevent the military establishment from insinuating itself into the civil branch of government and thereby growing 'paramount' to it." *Riddle v. Warner*, 522 F.2d 882, 884 (9th Cir. 1975) (citation omitted).[12]

---

[12] *See also* Memorandum from Theodore B. Olson, Assistant Att'y Gen., Off. of Legal Couns. (OLC), to William P. Tyson, Dir., Exec. Off. for U.S. Att'ys, Re: Applicability of 10 U.S.C. § 973(b) to JAG Officers Assigned to Prosecute Petty Offenses Committed on Military Reservations (May 17, 1983), https://www.justice.gov/olc/page/file/965131/dl?inline= ("1983 OLC Memo").

In 1983, DOJ's Office of Legal Counsel reviewed the practice of active-duty JAGs serving as SAUSAs and prosecuting petty offenses committed by civilians on military installations, concluding that absent a specific statutory exception, the practice violated 10 U.S.C. § 973(b). *See* 1983 OLC Memo at 1–5, 30–31. OLC stated that until Congress "specifically permit[s] the practice of using regular military officers to prosecute civil offenses *committed on military bases*," JAG officers could no longer perform those duties. *Id.* at 31–32 (emphasis added).

In response, Congress enacted 10 U.S.C. § 973(b)(2)(B), permitting military officers to "hold or exercise the functions of" certain civil federal offices "when assigned or detailed to that office or to perform those functions." *See* Act of Sept. 24, 1983, Pub. L. No. 98-94, tit. X, pt. A, § 1002, 97 Stat. 614, 655–56. An accompanying House conference report stated this provision allows JAG officers to continue assisting DOJ attorneys "with cases related to military installations and other military matters," but was "not intended to encourage substitution of military officers for civilian personnel in areas unrelated to the military." *See* H.R. Conf. Rep. No. 98-352, at 233 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 1160, 1170. The report did not mention the PCA.

The Senate report accompanying the legislation echoed these limitations. *See* S. Rep. No. 98-174, at 232–33 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 1081, 1122–23. The report cited the historical practice of using JAGs as SAUSAs

21

to prosecute "petty offenses committed on military installations" and stated that the amendment to § 973(b) would permit "the continuation of this practice" and adopt "the interpretation having previously been given by the Executive Branch to the existing section." *Id*. The report stressed that the amendment "does not sanction or endorse any use of military attorneys beyond that permitted under that interpretation." *Id*. at 233. It did not mention the PCA.

Three years later, Congress amended 10 U.S.C. § 806 to clarify that JAG officers serving as SAUSAs under 10 U.S.C. § 973(b)(2)(B) did not violate the UCMJ. *See* National Defense Authorization Act for Fiscal Year 1987, Pub. L. No. 99-661, tit. VIII, § 807(a), 100 Stat. 3816, 3909 (1986).[13] An accompanying House conference report stated that the amendment clarified when "judge advocates are detailed to assist, for example, the Department of Justice in *litigation involving the Department of Defense*." H.R. Conf. Rep. No. 99-1001, at 493 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 6529, 6552 (emphasis added). It did not mention the PCA.

After Congress enacted §§ 806(e)(1) and 973(b)(2)(B), the military services understood that those statutes authorized JAG officers to be SAUSAs in cases with a military nexus. Days after § 806(e)(1)'s enactment, the Deputy Secretary of Defense instructed the Service Secretaries that they "may assign or detail judge

---

[13] This amendment now resides at 10 U.S.C. § 806(e)(1).

advocates to the [DOJ] under 10 U.S.C. §§ 806(d) and 973(b)(2)(B) *with respect to cases of interest to the Department of Defense*." (emphasis added). The Secretary of the Army instructed the Army Judge Advocate General (TJAG) that "[r]ecent legislation codified our authority to assign or detail judge advocates to the [DOJ] to represent the United States *in cases of interest to the Department of Defense*. 10 U.S.C. § 806(d)." (emphasis added). The Army TJAG instructed his JAG subordinate leaders that he supported "prosecutions *arising out of Army operations*," including "prosecutions of misdemeanors and felonies *occurring on Army installations*" and SAUSA programs "to prosecute felonies *affecting Army activities* in U.S. District Court."[14] (emphasis added). The Army later embodied this understanding in its regulations. *See* 32 C.F.R. § 516.4(e)(1); AR 27-10, *Military Justice*, ch. 23.

Just two years after Congress enacted § 806(e)(1), the Secretary of Defense reinforced the military's narrow view of its law enforcement role, testifying that he was "absolutely opposed to the assignment of a law enforcement mission to the [DOD]" and "even more firmly opposed to any relaxation of the posse comitatus restrictions on the use of the military to search, seize and arrest," noting "these

---

[14] *The Army Lawyer*, Mar. 1987, at 3 (memo from TJAG to Staff and Command JAGs); *see also id.* at 5–6 (memos from Deputy Sec'y of Def. and Sec'y of Army), https://tile.loc.gov/storage-services/service/ll/llmlp/75615419_03-1987/75615419_03-1987.pdf.

views are shared throughout this Administration." *Role of the Department of Defense in Drug Interdiction: Joint Hearing Before the S. Comm. on Armed Servs. & H. Comm. on Armed Servs.*, 100th Cong. 267 (1988) (statement of Frank Carlucci, Sec'y of Def.).

Thus, historical practice, legislative history, and the military's contemporaneous and subsequent understanding all show that Congress never enacted §§ 543 and 806(e)(1) to operate as PCA exceptions. By consistently referring to JAG officers litigating matters related to the DOD, Congress intended them to serve only in roles that did not violate the PCA.

Congress knew how to enact a PCA exception. In 1982—shortly before it enacted § 806(e)(1)—Congress described a provision authorizing Attorney General requests for military assistance as "an additional exception to the 'Posse Comitatus' prohibition . . . ." H.R. Rep. No. 97-624 at 10–11. Congress spoke with equal clarity when enacting other PCA exceptions. *See, e.g.*, H.R. Rep. No. 97-71 pt. 2, at 12; S. Rep. No. 95-1071 at 37. But Congress never invoked the PCA when enacting §§ 543 and 806(e)(1)—an omission the magistrate judge failed to consider. That omission makes clear that Congress did not authorize JAGs to be SAUSAs "without limitation." *Contra* Order at 8.

The magistrate's conclusion also "produce[s] a result demonstrably at odds with the intentions of its drafters." *Ron Pair Enters., Inc.*, 489 U.S. at 242.

24

Congress repeatedly stated—and the military understood—that there must be a military nexus for JAGs to serve as SAUSAs. Given the PCA's history and Congress's enactment of § 973(b) to ensure "civilian preeminence in government," reading §§ 543 and 806(e)(1) to authorize JAG appointments "without limitation" subverts that intent. A holding that Congress authorized a JAG officer to prosecute a civilian where "it is undisputed that the Army has no interest" cannot stand.

For these reasons, 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) are not express PCA exceptions. To hold otherwise stretches the word "expressly," subverts congressional intent, and permits the government to wholesale replace civilian DOJ attorneys with military lawyers, allowing the military to "insinuat[e] itself into the civil branch of government and thereby grow[] 'paramount' to it." *Riddle*, 522 F.2d at 884. This Court should not lend its authority to the government's wrongful use of the military against civilians.

## III. This Court has authority to remedy the government's regulatory violations.

There is an independent reason to grant the motion to strike. The magistrate judge found that the government's "appointment of a JAG lawyer as a SAUSA to prosecute Mr. Johnson violates both 32 C.F.R. § 516.4 and AR 27-10," which limit JAG participation as SAUSAs to cases "in which the Army has an interest," but held that she lacked authority to remedy the violation. Order at 12–13. Given this

25

Court's inherent powers to control its courtroom, and that federal agencies must obey their own rules, this Court should strike government counsel's appearance.

First, this Court has authority to remedy these violations. It is "long recognized that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (quotation omitted). These powers include supervising attorneys, crafting sanctions for conduct abusing the judicial process, *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 749 (8th Cir. 2018), and disqualifying counsel, *see Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1154 (8th Cir. 1999).

The Court should exercise that authority here. As the magistrate judge recognized, "[a]gencies must follow their own regulations." *Sarail A. v. Bondi*, 803 F. Supp. 3d 775, 779 (D. Minn. 2025) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). "Federal regulations have the force and effect of law," *Resol. Tr. Corp. v. Home Sav. of Am.*, 946 F.2d 93, 96 (8th Cir. 1991), and courts can remedy their violation. *See, e.g.*, *Service v. Dulles*, 354 U.S. 363, 388 (1957) (holding federal government employee's dismissal invalid when agency regulations were violated); *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959) (same). Indeed, judges in this district have recently granted relief against the

26

federal government for regulatory violations. *See, e.g.*, *Roble v. Bondi,* 803 F. Supp. 3d 766, 770 (D. Minn. 2025); *Sarail A.*, 803 F. Supp. 3d at 785.

The regulations here are not some obscure internal policy document—they are a binding rule published in the Code of Federal Regulations that establish jurisdictional restraints when the Army can prosecute civilians. The PCA and regulations like 32 C.F.R. § 516.4(e) protect civilians from unauthorized military involvement in civilian affairs. A defendant has a cognizable interest in ensuring the military cannot wrongfully prosecute him in violation of those regulations.

The government's violation of its regulations also undermines the basis for government counsel's appointment under 28 U.S.C. § 543. That statute authorizes a SAUSA's appointment when the "public interest so requires," yet the public interest cannot require a SAUSA violating their agency's regulations that reference § 543. 32 C.F.R. § 516.4; AR 27-10 ¶ 23-4(a). When a prosecutor is appointed unlawfully, courts have the authority and obligation to remedy the violation. *See United States v. Comey*, 810 F. Supp. 3d 768, 786 (E.D. Va. 2025) (dismissing indictment because an Interim U.S. Attorney's appointment was invalid); *United States v. Giraud*, 795 F. Supp. 3d 560, 582 (D.N.J. 2025) (disqualifying an Interim U.S. Attorney because her appointment was invalid).

Finally, striking the appearance of government counsel resolves any potential conflict with his ethical obligations. After the magistrate judge's ruling,

27

the DOJ is forcing government counsel—an Army officer subject to the UCMJ—to violate Army regulations. Army Rule of Professional Conduct 1.13(c) states that when a higher authority insists upon conduct that is "clearly a violation of a legal obligation to the Army, adverse to the legal interests or obligations of the Army, or a violation of law," the Army lawyer may terminate representation—and then adds a prohibition: "In no event shall the lawyer participate or assist in the illegal activity." U.S. Dep't of Army, Regul. 27-26, *Rules of Professional Conduct for Lawyers* § 1.13 (Mar. 26, 2025).

Government counsel did not create this conflict. The DOJ put him in an untenable position by directing an Army officer to prosecute a case his service's regulations do not permit. This Court has inherent authority to protect the integrity of proceedings in its courtroom, and it should exercise that authority here—not to fault government counsel, who serves his country with honor, but to relieve him of an obligation the DOJ had no right to impose.

## CONCLUSION

The Posse Comitatus Act stands as a bulwark against military intrusion into civilian legal affairs. By assigning a JAG to prosecute a civilian offense without any military nexus, the government has crossed a clear line—one drawn by Congress and memorialized in the Army's own regulations. *Amici* respectfully

28

request that this Court grant Mr. Johnson's motion to strike the appearance of government counsel.

Respectfully submitted,

Dated: June 5, 2026

Zachary T. West
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 163
Washington, DC 20006
Tel: (202) 579-4582
Fax: (202) 769-3176
zachary.west@protectdemocracy.org

Beau C. Tremitiere
PROTECT DEMOCRACY PROJECT
300 Center Ave, Suite G-251
Superior, CO 80027
Tel: (202) 579-4582
Fax: (202) 769-3176
beau.tremitiere@protectdemocracy.org

*Counsel for Amici Curiae*

/s/ John R. Marti
John R. Marti
    *Counsel of Record*
Dorsey & Whitney LLP
50 South 6th St, Suite 1500
Minneapolis, MN 55402
Tel: (612) 492-6775
Fax: (612) 677-3265
marti.john@dorsey.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Local Rule 7.1(f) because it contains 6,931 words, as determined by the Word Count function of Microsoft Word. It also complies with the typeface and type-style requirements of Local Rule 7.1(h) because it was prepared with Microsoft Word and uses 14-point proportionately spaced Times New Roman font.

Dated: June 5, 2026                                    /s/ John R. Marti

# APPENDIX: List of *Amici*[15]

**Colonel Lawrence O. Anderson, U.S. Marine Corps Reserve (Ret.)**, served as a judge advocate in the U.S. Marine Corps on active duty before continuing his service in the reserves, retiring as a colonel in 1999. From 1976 to 2001, he also served as an Assistant U.S. Attorney in the Department of Justice, first in the Eastern District of Wisconsin and later in the Northern District of Georgia, where he handled narcotics and international money laundering conspiracy cases.

**Captain John H. Bennett, U.S. Navy (Ret.)**, served as a judge advocate in the U.S. Navy for 27 years, including assignments as a trial judge and appellate judge on the United States Navy-Marine Corps Court of Criminal Appeals. He also served as an Assistant U.S. Attorney in the Department of Justice for nearly 28 years.

**Lieutenant Colonel Thomas Calhoun-Lopez, U.S. Army (Ret.)**, is a counsel at a firm in Minneapolis. Prior to joining his firm, Tom served as an Assistant U.S. Attorney for 16 years, most recently as the Chief of the Violent & Major Crimes Section for the District of Minnesota. He resigned from his position in January of this year. Prior to joining the Justice Department, Tom was an active-duty officer in the U.S. Army, where he deployed to Iraq twice (once as a combat arms officer and once as a judge advocate). He retired from the Army as a lieutenant colonel.

**Lieutenant Colonel Geoffrey Corn, U.S. Army (Ret.)**, served in the U.S. Army for 21 years, including assignments as the Army's senior law of war expert advisor, tactical intelligence officer in Panama; supervisory defense counsel for the Western United States; Chief of International Law for U.S. Army Europe; Professor of International and National Security Law at the U.S. Army Judge Advocate General's School; and Chief Prosecutor for the 101st Airborne Division. He is currently the George R. Killam Jr. Chair of Criminal Law and Director of the Center for Military Law and Policy at Texas Tech University School of Law.

**Eric Dobberteen** served on active duty as a judge advocate in the U.S. Navy, during which he tried numerous courts-martial and served as counsel to a three-star admiral. Following his naval service, he was appointed as an Assistant U.S. Attorney for the Central District of California. As an AUSA, he tried to completion over 25 jury and bench trials, including the first Continuing Criminal Enterprise

---

[15] Affiliations in the subsequent biographies are shown for identification purposes only.

prosecution in the Central District, and successfully litigated two terrorist prosecutions employing the Foreign Intelligence Surveillance Act. He also served as an Assistant Division Chief in that office's Criminal Division in charge of Training and General Crimes.

**Lieutenant Commander Eugene R. Fidell, U.S. Coast Guard Reserve (Ret.)**, served as a judge advocate in the U.S. Coast Guard. He is a co-author of the casebook Military Justice Cases and Materials (4th ed. 2023). He has taught military justice at Yale, Harvard, the University of Virginia, New York University, and American University and is currently a Visiting Lecturer in Law at Yale Law School. He co-founded the National Institute of Military Justice and edits the Global Military Justice Reform blog. He is admitted to practice in Massachusetts, Connecticut, the District of Columbia, and New York.

**Colonel Tony Ghiotto, U.S. Air Force (Ret.)**, is a Teaching Associate Professor of Law at the University of Illinois College of Law. He retired as a member of the Air Force JAG Corps following his promotion to colonel. As an Air Force judge advocate, he served as a prosecutor, an appellate defense counsel, a chief of military justice, an Air Staff counsel at the Military Justice Division, a deputy staff judge advocate, graduated from Air Command and Staff College in-residence, and as a staff judge advocate. Additionally, he deployed to Parwan Province, Afghanistan, where he helped establish Task Force 435 and represented the United States in over 100 detainee review board hearings. He also performed special duties at the Office of the Secretary of Defense, Defense Legal Policy Board, in its investigation and report to the Secretary of Defense regarding the military departments' responses to civilian casualties caused by American servicemembers in Iraq and Afghanistan. He is a fellow with the National Institute of Military Justice and frequently writes and speaks on issues relating to the lawfulness of military orders and the domestic use of the military.

**Colonel Robert Don Gifford, U.S. Army Reserve (Ret.)**, began his legal career as an active-duty Judge Advocate before retiring with 23 years of active and reserve service. As a junior officer, he served as a SAUSA for the Western District of Kentucky and later served as an Assistant U.S. Attorney for 15 years. In 2007–08, he was recalled to active duty to the Military Commissions at Guantanamo Bay. He has also served as an instructor at the Army's "JAG School," an adjunct law professor at three law schools, and is a graduate of the Army War College. Col.(R) Gifford founded his own law firm in 2018, serves as a part-time tribal court judge to several Native American Tribes, and is the Chair of the Military &

Veterans Law Section for his state bar association. In 2025, Col.(R) Gifford was selected as the Clarence Darrow Award winner as Oklahoma's top trial lawyer.

**Rear Admiral (Upper Half) F. Stephen Glass, U.S. Navy (Ret.)**, served in the U.S. Navy for twenty-nine years, serving in Staff Judge Advocate and Force Judge Advocate billets advising Flag rank Commanders regarding military law and procedures, culminating his career as the reserve Judge Advocate General of the Navy. He was awarded the Navy Marine Corps Distinguished Service Medal.

**Rear Admiral (Upper Half) Donald J. Guter, U.S. Navy (Ret.)**, served on active duty in the Navy for 29 years, first as a surface warfare officer and then in the Judge Advocate General Corps, ultimately serving as the Judge Advocate General of the Navy from 2000–2002. After retiring from active duty, he served as Dean of Duquesne Law School and subsequently Dean of South Texas College of Law Houston.

**B. Todd Jones** is a former Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives and a two-time U.S. Attorney for the District of Minnesota. He served for fourteen years in the U.S. Marine Corps on both active duty and in the reserves, serving as an infantry officer before transitioning into the role of a judge advocate, where he acted as both a trial defense counsel and a prosecutor in court-martial proceedings. After his active duty military service, he joined the Department of Justice, serving as an Assistant U.S. Attorney and eventually holding the post of U.S. Attorney for the District of Minnesota under two different presidential administrations.

**Lieutenant Colonel Joshua E. Kastenberg, U.S. Air Force (Ret.)**, is a professor at the University of New Mexico School of Law. He served as a judge advocate in the United States Air Force with two full-length deployments to Iraq and one to Guantanamo in his 20 years of service. His last assignment for a five-year period was as a military judge. He teaches criminal law, evidence, and constitutional law.

**Charles Kovats** served in the Department of Justice for twenty years, including fifteen in the District of Minnesota where he served as an AUSA, Criminal Division Chief, and Acting U.S. Attorney. He started his DOJ career as an AUSA in the Central District of California where he worked from 2005–2010 and ended his career with DOJ's National Security Division (2024–2025). He also served for twenty-eight years in the United States Army, including more than twenty years in the Judge Advocate General's Corps, both on active duty and as a member of the reserves. During his service with the Army, he was deployed on three occasions.

**Major General Steven J. Lepper, U.S. Air Force (Ret.)**, served for 35 years in the United States Air Force as a judge advocate in a variety of roles including Deputy Legal Counsel to the Chairman of the Joint Chiefs of Staff, commander, and military judge. He culminated his service as Deputy Judge Advocate General of the Air Force.

**Jason Lien** is a veteran of the U.S. Navy and served on active duty from 1998 to 2002 in the U.S. Navy Judge Advocate General's Corps. Jason was stationed at the Navy Legal Service Office Central at Naval Air Station Pensacola, Florida, where he represented Sailors, Marines and Coast Guard personnel in courts-martial and administrative hearings. While on active duty, he also served as appellate counsel representing the U.S. Navy before the Navy-Marine Corps Court of Criminal Appeals and Court of Appeals for the Armed Forces. After he left active duty in 2002, Jason served for a number of years in the active reserves with Navy Judge Advocate General Corps while he practiced law at Maslon LLP, where he is a partner today.

**Lieutenant Colonel John R. Marti, U.S. Marine Corps (Ret.)**, served for 21 years in the U.S. Marine Corps as an infantry officer and judge advocate. During one assignment he was appointed as Special Assistant U.S. Attorney prosecuting offenses with a connection to a Marine Corps base. He also served as a federal prosecutor for 18 years, including for a time as Acting U.S. Attorney for the District of Minnesota.

**Lieutenant Colonel Daniel Maurer, U.S. Army (Ret.)**, served as a judge advocate prosecutor, appellate counsel, an installation's chief of military justice supervising seven prosecutors and support staff, a combat-deployed brigade's senior counsel, strategist for the Army's Chief of Staff, chief of operational law for a contingency command headquarters in Italy, Assistant Professor at the U.S. Military Academy, and Associate Professor at the U.S. Army Judge Advocate General's Legal Center and School. He is currently an Associate Professor of Law at Ohio Northern University's Pettit College of Law, and is author of numerous scholarly works on civil-military relations and military justice. He is on the Board of Directors of the National Institute of Military Justice.

**Colonel Mark Maxwell, U.S. Army (Ret.)**, served for over 25 years as a judge advocate in the U.S. Army. His assignments included serving as the first Strategic Initiatives Officer for the U.S. Army Judge Advocate General's Corps, Staff Judge Advocate for V Corps, the Legal Advisor to NATO's International Security Assistance Force Joint Command in Afghanistan, and the first Chief of the JAG

Corps' Defense Counsel Assistance Program. As a civilian, he also served as Principal Deputy Legal Counsel at U.S. Africa Command, where he led a legal team of 24 attorneys and paralegals advising on international law, operational law, and military justice. He has published widely on the law of armed conflict, the Posse Comitatus Act, and civil-military relations, and currently directs the Veterans Law Clinic at Texas Tech University School of Law.

**Commander Brian McNamara, U.S. Coast Guard (Ret.)**, served on active duty with the U.S. Coast Guard for 25 years in a variety of operational, mission support, and military justice roles. He holds a full-time faculty appointment at a major research university, where he teaches and writes at the intersection of public administration and law. He has taught as an adjunct faculty member at two law schools and is the owner and sole member of Brian McNamara Law PLLC, a Virginia law firm focusing on regulatory and public interest issues.

**Rear Admiral James E. McPherson, U.S. Navy (Ret.)**, served as the Acting Secretary of the Navy, Under Secretary of the Army, and General Counsel for the Army under President Donald Trump. He retired as a Rear Admiral in the U.S. Navy after several decades of service, including time as Judge Advocate General of the Navy under President George W. Bush.

**Lieutenant Colonel Franklin D. Rosenblatt, U.S. Army (Ret.)**, is an Associate Professor at Mississippi College School of Law and President of the National Institute of Military Justice.

**Steven L. Schleicher** served as an AUSA in the District of Minnesota from 2003–2017, prosecuting cases involving violent crime, organized crime and drug trafficking. Prior to that, he spent three years as an Assistant Minnesota Attorney General prosecuting homicides and complex narcotics cases and five years as an Assistant Winona County Attorney. In private practice, Mr. Schleicher served as a Special Assistant Minnesota Attorney General and was trial counsel in the prosecution of Derek Chauvin for the murder of George Floyd. Mr. Schleicher served in the U.S. Army Reserve JAG Corps from 2001–2010, including a one-year active deployment to Heidelberg, Germany in 2006 in support of Operation Iraqi Freedom.

**Hank Shea** is a Senior Distinguished Fellow at the University of St. Thomas School of Law, where he has taught for eighteen years. He previously served as an Assistant U.S. Attorney in the District of Minnesota for twenty years. Earlier in his career, Mr. Shea also served four years of active duty as an Assistant to the Army

General Counsel in the Pentagon and then seven years as a Reserve Officer in the Army's Judge Advocate General Corps in the same office.

**Major General F. Andrew Turley, U.S. Air Force (Ret.)**, served in the U.S. Air Force for more than 27 years, in a wide variety of active duty, Air Force Reserve and Air National Guard judge advocate positions at the wing, major command and Air Staff levels, culminating in his appointment as the Ninth Air National Guard Assistant to The Judge Advocate General. As a federal civilian lawyer, he held senior level legal positions with several federal agencies, including the Department of Justice, the White House, and Department of the Air Force, and served as the general counsel of a small DOD agency. He is a retired member of the Senior Executive Service.

**Lieutenant Colonel Rachel E. VanLandingham, U.S. Air Force (Ret.)**, served for over twenty years on active duty in the U.S. Air Force following her matriculation from the U.S. Air Force Academy, including as a nuclear surety inspector and squadron section commander. After the Air Force assigned her to attend law school through the military's Funded Legal Education Program, she served the majority of her career as a judge advocate in numerous roles including as Chief of International Law at Headquarters, U.S. Central Command, where she advised on the armed conflicts in Afghanistan and Iraq and served as the Command's chief liaison to the International Committee of the Red Cross on detainee treatment standards. She also served as a military prosecutor, criminal defense attorney, and appellate defense attorney, with deployments to the Middle East. She is currently the Irwin R. Buchalter Professor of Law and Co-Associate Dean of Research at Southwestern Law School, and is President Emerita of the National Institute of Military Justice, where she was instrumental in the passage of the most significant military justice legislative reform since the 1950s.

**Lieutenant Colonel Charles G. Warren, U.S. Air Force (Ret.)**, served for 21 years in the U.S. Air Force as a judge advocate, including assignments as a trial judge, appellate judge on the Air Force Court of Criminal Appeals, and Chief of the Military Justice Division at the Air Force Judge Advocate General's School. He also twice deployed to combat zones in Iraq and Afghanistan and was selected to serve on the Military Justice Review Group, which conducted the first comprehensive overhaul of the Uniform Code of Military Justice since 1983. He is currently an Assistant Professor of Law at Campbell University School of Law.

**Andrew Winter** retired from the U.S. Attorney's Office for the District of Minnesota in 2025 after working as an AUSA for 23 years, prosecuting cases involving national security, cybercrime, and organized crime. Prior to that, he spent ten years as an Assistant Hennepin County Attorney prosecuting violent and general crimes. Mr. Winter served in the U.S. Army Reserve JAG Corps from 2001–2014, including a deployment to Baghdad, Iraq from 2009–2010 in support of Operation Iraqi Freedom.