UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Court File No. 26-mj-81 (KMM/SGE) |
| Plaintiff, | |
| v. | **MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT AND VINDICTIVE PROSECUTION AND FOR AN EVIDENTIARY HEARING** |
| Paul Johnson, | |
| Defendant. | |

Defendant Paul Johnson moves pursuant to Fed. R. Crim. P. 12(b)(3) for an evidentiary hearing to adduce evidence related to the government's outrageous conduct and vindictive prosecution in this case, and for the Court to dismiss the Information because this outrageous conduct and vindictive prosecution violated and continues to violate Mr. Johnson's Fourth, Fifth, and Sixth Amendment rights.

## I.    THE GOVERNMENT STOPPED MR. JOHNSON IN VIOLATION OF THE FOURTH AMENDMENT.

On January 22, 2026, two weeks after the murder of Renee Good and just days before the murder of Alex Pretti, Mr. Johnson was driving around his neighborhood in North Minneapolis, honking his horn and yelling to protest the presence of ICE and CBP in his community and alert his neighbors. He was following some ICE/CBP vehicles and was at the same time being followed by ICE/CBP vehicles. This conduct was safe, lawful and protected by the First Amendment.

At one point during this pursuit, agents discussed a plan to interfere with and discourage Mr. Johnson from exercising his First Amendment rights by boxing him in and by having the ICE vehicle he was following stop in the middle of the road, back up, and "kiss [Mr. Johnson's] bumper." As ICE was executing this maneuver, but before this vehicle made contact with Mr. Johnson's van, he drove away and the agents followed him.[1]

Around 30 minutes later, agents boxed in Mr. Johnson's van in a gas station parking lot. They swarmed his car and smashed the driver's side window. Mr. Johnson refused to exit his van – as was his right – and yelled for help, calling out, "I haven't done anything, they rammed my van."

Warrantless arrests must be supported by probable cause. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Here, Border Patrol and ICE officers unjustifiably conducted a warrantless arrest of Mr. Johnson without probable cause that he had committed any offense and outside the scope of their limited authority under federal law. Mr. Johnson was literally sitting in his van in a parking lot when ICE assaulted and arrested him.

---

[1] ICE's unconstitutional detention, intimidation, and assault of lawful legal observers like Mr. Johnson was endemic during Operation Metro Surge. *See, e.g.,* First Amended Complaint, *Tincher, et al. v. Noem, et al.*, Case No. 25-cv-04469 (KMM/DTS), ECF No. 136 at 48-59 (describing dozens of incidents similar to Mr. Johnson's arrest and citing sworn declarations submitted in support). Indeed, less than one week before Mr. Johnson's arrest, Judge Menendez issued an Order in *Tincher*, in which she found that ICE's conduct in stopping and seizing lawful legal observers violated both the First and Fourth Amendments. Order, ECF No. 85 at 44-45, 66-67, Case No. 25-cv-04669 (KMM/DTS) (filed January 16, 2026).

## II.   THE GOVERNMENT VIOLENTLY ASSAULTED MR. JOHNSON PRIOR TO HIS ARREST IN VIOLATION OF THE FOURTH AMENDMENT, PERMANENTLY INJURING HIM.

After boxing in Mr. Johnson's van, armed agents surrounded him and he was thoroughly blocked in by ICE/CBP vehicles. Agents demanded Mr. Johnson get out of the van, but he refused. Agents smashed his windows, unlocked the doors, and climbed into the van, where they assaulted Mr. Johnson. Agents yelled at Mr. Johnson to "get out of the fucking car" while they punched him in the head as he screamed for help. Mr. Johnson resisted grabbed onto the steering wheel to avoid being pulled out of the van. During this assault, an agent approached the van yelling, "I'm gonna spray him," and pepper-sprayed Mr. Johnson directly in the face from less than one foot away. *Id*. at 18:52-53. At this point, agents were able to pull Mr. Johnson from his van and pinned him onto the frozen ground. He yelled in pain and pleaded, "you still haven't told me what I've done," as they yanked his injured arm behind his back.

The probable cause statement filed by Agent Richard Berger states, among other things, that earlier on January 22 and prior to his arrest, Mr. Johnson "exited his vehicle, approached the vehicle driven by CBPOs with a baseball bat . . . [and] sprayed the passenger side of [an ICE] vehicle with . . . [OC spray]." ECF No. 1-1. None of this is true. Notably, Agent Berger has a documented pattern of submitting false affidavits in the District of Minnesota, which in one case led Magistrate Judge Schultz to state that he had become "concerned with the veracity of [Agent Berger's] affidavits" and with respect to

3

one affidavit in particular, stating: "that's a fake affidavit." [2] *See also* Report and Recommendation, *United States v. Adbebe*, Case No. 26-mj-77, ECF No. 64 at 10-11, (filed June 3, 2026) (noting that video evidence directly contradicted statements contained in a sworn affidavit from Agent Berger).

### III. THE GOVERNMENT HELD MR. JOHNSON INCOMMUNICADO AT THE HENNEPIN COUNTY MEDICAL CENTER AND DENIED HIM ACCESS TO COUNSEL IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS.

Agents handcuffed Mr. Johnson, bundled him into an unmarked CBP vehicle and whisked him away as a gathering crowd hurled expletives at them. CBP ultimately drove Mr. Johnson to HCMC. There, they kept Mr. Johnson confined to his hospital room under armed guard. Agents photographed him in his hospital bed, clad in his gown, while he slept under the influence of painkillers. Incredibly given his serious injuries, agents kept Mr. Johnson shackled to his hospital bed for the entire five days he was at HCMC with the only break being when he went to PT appointments.

Agents told Mr. Johnson he could not make any phone calls or contact family to inform them of his injuries or the fact that he was being held at HCMC. Agents did not make any attempt to locate or inform Mr. Johnson's family of his detention at the hospital. Mr. Johnson's wife knew that he had been violently arrested but had no idea where he was, whether he was injured, or if he was even alive.

---

[2]    https://kstp.com/kstp-news/top-news/us-judge-challenges-credibility-of-evidence-in-ice-arrest-case/

The morning after Mr. Johnson's arrest, a nurse smuggled a phone to Mr. Johnson when agents were not looking, and he was able to tearfully call his wife briefly to let her know he was being held incommunicado at the hospital. She immediately drove to the hospital and asked to see him. At first, hospital staff told her that he was not at the hospital. When she persisted, hospital administrators came to the emergency room entrance and told her that she could not see Mr. Johnson. They told her that it was not their decision but that they were directed by ICE and CBP not to let anyone see Mr. Johnson.

Mr. Johnson's wife then worked to obtain legal counsel to see if they could get access to him. Multiple attorneys attempted to visit Mr. Johnson at HCMC but were denied entry by hospital staff, again acting under the direction of ICE and CBP. It was not until the undersigned interceded with management at the U.S. Attorney's office that ICE finally relented and informed hospital staff that counsel could visit Mr. Johnson, more than 24 hours after he had been arrested, on the evening of January 23. When the undersigned entered Mr. Johnson's hospital room, Mr. Johnson began sobbing from relief that someone had come to see him. He was terrified and was in significant pain and distress from what had happened, given his isolation he feared ICE would never let him meet with a lawyer and would hold him there indefinitely. When counsel returned on January 24 to check on Mr. Johnson, however, ICE again instructed HCMC staff to deny counsel entry and neither counsel nor Mr. Johnson's wife were allowed to see him until after he was finally discharged from the hospital on January 27, 2026.

5

Notably, ICE did not arrest Mr. Johnson or take him into custody after his discharge from the hospital, they simply unshackled him and instructed the hospital to let him go, which raises the question of why agents blocked access to Mr. Johnson, shackled him to his hospital bed even as he was receiving treatment, held him under armed guard, and forbade any phone calls to his family or lawyers.

This misconduct by ICE and CBP was not just cruel and unnecessary to achieve any legitimate law enforcement objective. It also violated the Fifth and Sixth Amendments. "[D]etainees have a substantial due process interest in effective communication with their counsel." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989). They "must have a reasonable opportunity to seek and receive the assistance of attorneys." *Id.* at 1052 (citation omitted).

Finally, Mr. Johnson's need for medical care is ongoing. The agents' assault and use of excessive force when arresting Mr. Johnson caused permanent brain injury and essentially destroyed his left shoulder, requiring complete reconstructive surgery. Mr. Johnson's ability to work – he is a carpenter and general contractor – has been severely curtailed by his injuries. Further, he requires multiple occupational, speech, ocular and therapy appointments each week to address his traumatic brain injury and the related speech, vision, memory and coordination problems afflicting him, as well as psychotherapy to deal with his PTSD and physical therapy to assist with the rehabilitation of his shoulder.

6

IV.    **THE GOVERNMENT'S STAGED ARREST AND DOXING OF MR. JOHNSON VIOLATED THE COURT'S SEALING ORDER AND THE FIFTH AMENDMENT.**

As if the physical abuse, kidnapping, and incommunicado detention were not enough, Mr. Johnson has been subjected to staged photos and doxxing in an online "perp walk" by the Department of Justice. The day after Mr. Johnson was unceremoniously released from his hospital confinement, the government required him to self-surrender or be arrested pursuant to a warrant.

After self-surrendering, and during the booking process, he was posed for full body photographs with an HSI agent while awaiting his initial appearance. These photographs were staged and taken by HSI agents for public relations purposes and unrelated to the booking process, which is normally carried out by U.S. Marshals – not HSI agents, and which does not involve full body photographs. In fact, Mr. Johnson had his actual booking photo taken by the Marshals shortly after these staged, posed photographs were taken by HSI.

In another AFO case from January 2026 – *U.S. v. Jama* – the government was ordered to produce all DHS text messages related to the similar staged arrest, photographing and doxxing of that defendant. One of the text messages between ICE agents lays out clearly that these pictures were retaliatory and meant as a tool for public harassment rather than serving any legitimate law enforcement function. The text reads:

> When we get to the jail, can I get a couple folks in HSI vests or jackets to take a photo with their back to the camera with JAMA for me? Trophy pic is super important to JOC 🙄 and we HSI shit so FBI

> HSI shit so FBI can't take credit.

"JOC" is the "Joint Operation Center" that was supervising and directing Operation Metro Surge.[3] The "trophy pic" discussed in this text was "super important" because Ms. Bondi intended to publish the photos of that defendant and others (including Mr. Johnson), to intimidate, doxx, and harass them, and to chill the exercise of their First Amendment rights.

HSI's staged photograph of Mr. Johnson was immediately shared with then-Attorney General Pam Bondi, who had scheduled a visit to Minneapolis that day as part of a blatant public relations stunt meant to distract from ICE agents' recent murder of Alex

---

[3] Notably, after disclosing this text message and other related documents, the government has now filed a motion to dismiss Mr. Jama's case with prejudice. That is unsurprising. The government has now outright dismissed at least eighteen – or roughly 50% - of the 18 U.S.C. § 111 cases it brought during Operation Metro Surge.

Pretti. This PR stunt included orchestrating the self-surrender and staged photos of Mr. Johnson and others processed that day, along with the coordinated release of said photos online. After receiving Mr. Johnson's staged photo, Ms. Bondi published Mr. Johnson's name and the staged photo on her official DOJ X account. Ms. Bondi knew full well that publishing Mr. Johnson's photo and identity on her X account would result in widespread online doxxing and harassment. Indeed, the post was viewed more than 3 million times and was "retweeted" more than 7,000 times by other users. Notably, the HSI agent who posed Mr. Johnson for the PR photo turned his back when the picture was taken to protect his identity, demonstrating an acknowledgement of the consequences of such photos being publicly disclosed in a high-profile manner.

The U.S. Department of Homeland Security ("DHS")—the agency whose agent swore out the Complaint against Mr. Johnson filed under seal—echoed Ms. Bondi's post in a public posting the afternoon of January 28, 2026. Again including Mr. Johnson's name and the staged photograph, DHS called Mr. Johnson and the other charged individuals "Anti-ICE anarchists" who are "fighting to keep rapists, murders [sic], drug dealers, and predators in their community."[4] These false statements, and the highly improper doxxing of Mr. Johnson, impede his right to a fair trial.

U.S. Marshal policy on prisoner photographs states: "U.S. Marshals employees will not pose prisoners for pictures (except as necessary for identification purposes at district office or detention facilities) or in any way subject prisoners to embarrassment." U.S.

---

[4] https://x.com/DHSgov/status/201663168872961598.

Marshals' policy further states: "It is USMS policy to release photographs of fugitives or other prisoners only for law enforcement purposes . . . . Once a prisoner has been arrested, the general rule is that no release should be made because release of photographs of that prisoner to the media or public would not serve law enforcement purposes." *See also* 28 U.S.C. § 50.2(b)(7) ("[DOJ] representatives should not make available photographs of a defendant unless a law enforcement function is served thereby.")

Similarly, DOJ policy prohibits the conduct that occurred here. *See* 28 C.F.R. §§ 50.2(a)(2) (providing that "the release of information for the purpose of influencing a trial is, of course, always improper"), (b)(2) (stating the DOJ officials shall not "furnish any statement or information for the purpose of influencing the outcome of a defendant's trial"), (b)(6)(i) and (vi) (prohibiting DOJ officials from releasing information that "generally tends to create dangers of prejudice without serving a significant law enforcement function," including "[o]bservations about a defendant's character" and "[a]ny opinion as to the accused's guilt"), (b)(7) (providing that DOJ officials "should take no action to encourage or assist news media in photographing or televising a defendant or accused person being held or transported in Federal custody" and "should not make available photographs of a defendant unless a law enforcement function is served thereby").

In short, the creation and publication of Defendant's photo, the inflammatory comments by Ms. Bondi, and the doxxing of Mr. Johnson and his fellow arrestees violated both DOJ and U.S. Marshal policy, as well as the Fifth Amendment. Ms. Bondi's

10

publication of Mr. Johnson's photo, name, and charges prior to Defendant's initial appearance also violated the Court's sealing order regarding this matter. See ECF No. 4.

Notably, several judges in this District have already concluded that such conduct violated the Court's sealing order and supported claims of vindictive prosecution and outrageous government conduct. *E.g.,* Report and Recommendation, *United States v. Adbebe*, ECF No. 64, 26-mj-00077 (SRN/ECW) (filed June 3, 2026) (explaining that "the Court found these disclosures relevant to both Mr. Adbebe's vindictive prosecution and outrageous government conduct defenses," and noting "the potential for such photos to impede Mr. Adbebe's right to a fair trial"); Order, *U.S. v. Ahmed*, Case No. 26-mj-24 (JRT/ECW), ECF No. 73 at 9 (filed June 12, 2026); Order, *U.S. v. Flores*, Case No. 26-mj-57 (PAM/DJF), ECF No. 26 at 2 (filed February 24, 2026).

In *United States v. Adbebe*, Magistrate Judge Wright described the deleterious effect on defendants' due process rights from these staged arrests, publicity and doxxing:

> Based on the record, the Government was eager to publicize the charges against Mr. Adbebe and fifteen others during Operation Metro Surge due to those persons' alleged "Anti-ICE" activity and to send the message that federal law enforcement "expect[ed] more arrests to come," where former Attorney General Bondi had "said it before and [will] say it again: NOTHING will stop President Trump and this Department of Justice from enforcing the law." The Government's eagerness to accomplish these goals resulted in violations of Department of Justice policies against furnishing statements or information that may reasonably be expected to influence the outcome of a defendant's trial (where such policies acknowledge that "the release of information for the purpose of influencing a trial is, of course, always improper"), against releasing a photograph of a defendant being held in federal custody unless it serves a law enforcement function, and against releasing information that generally tends to create a danger of prejudice

11

(including observations about a defendant's character) without serving a significant law enforcement function.

Indeed, as the Court stated at the hearing: "The Court is concerned that the Government's position and contentions with respect to this motion [for a protective order relating to the X posts] show[]that they do not take the concerns around Mr. Adbebe's right to a fair trial seriously, notwithstanding the fact that case law recognize[s] this concern, and further suggests that the Government does not intend to respect these concerns going forward."

*Id.* at 31-32 (internal citations omitted).

Similarly, in *U.S. v. Ahmed*, a case involving another one of the defendants subjected to the staged photo and doxxing conduct, Judge Tunheim wrote: "In short, the Government's actions in this case violated a Court order, likely violated the Department of Justice's own policies, and undermined the presumption of innocence that lies at the heart of our criminal justice system."). Order, Case No. 26-mj-24 (JRT/ECW), ECF No. 73 at 12 (filed June 12, 2026).

## V.   GIVEN THE OUTRAGEOUS CONDUCT DESCRIBED ABOVE, THE COURT SHOULD ORDER AN EVIDENTIARY HEARING.

"The Eighth Circuit has recognized that outrageous government misconduct may violate defendant's due process rights and prevent 'the government from invoking judicial processes to obtain a conviction' in cases where 'the most intolerable government conduct' has occurred." *United States v. Augustine Med.*, *Inc.,* No. CRIM.03-321, 2004 WL 502183, at *1 (D. Minn. Mar. 11, 2004) (quoting *United States v. Pardue*, 983 F.2d 835, 840, 841–42 (8th Cir. 1993) (internal quotations omitted).

Government misconduct violates the Due Process clause and warrants dismissal when it "shocks the conscience of the court." *United States v. Horton*, 756 F.3d 569, 576 (8th Cir. 2014); *see also United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1999) (internal quotations omitted) ("Government conduct that is 'so outrageous and shocking that it exceeds the bounds of fundamental fairness may violate the [Fifth Amendment] Due Process clause and bar a subsequent prosecution.'") (citation omitted). "Whereas the defense of entrapment focuses on the predisposition of the defendant to commit the crime, the defense of outrageous government conduct focuses on the government's actions." *United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (internal quotation omitted).

The outrageous government conduct defense applies, for example, "[w]here the government essentially generates a new crime for the purpose of prosecuting it or induces a defendant to become involved for the first time in certain criminal activity, as opposed to merely interposing itself in an ongoing criminal enterprise. *United States v. Mosley*, 965 F.2d 906, 911 (10th Cir. 1992) (citing cases); *see also United States v. Boone,* 437 F.3d 829, 842 (8th Cir. 2006) (the defense applies "where law enforcement officers have sought to create crimes in order to lure a defendant into illegal activity."); *United States v. Pardue,* 983 F.2d 835, 841 (8th Cir.1993); *United States v. Huff,* 959 F.2d 731, 734 (8th Cir.1992); *United States v. Mazzella,* 768 F.2d 235, 238 (8th Cir.1985).

Where a defendant raises "specific facts that are sufficient to raise a significant doubt about the propriety of the government's actions," the district court should hold an evidentiary hearing to develop the facts relevant to the defendant's defense of outrageous

13

government misconduct. *United States v. Valona*, 834 F.2d 1334, 1340 (7th Cir. 1987) (cited in *United States v. Kelley*, 152 F.3d 881, 885 (8th Cir. 1998)); *see also Augustine Med.*, 2004 WL 502183, at *1 (the Court held an evidentiary hearing on defendants' motion to dismiss alleging outrageous government conduct).

Similarly, to demonstrate vindictive prosecution, a defendant must "show that the prosecution was brought in order to punish" him "for the exercise of a legal right." *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004). A prosecution brought "in retaliation for" engaging in statutorily or constitutionally protected conduct is unlawful. *United States v. Punelli*, 892 F.2d 1364, 1371 (8th Cir. 1990). A finding of "bad faith" or retaliatory motive is fatal to a prosecution, "*regardless* of whether valid convictions conceivably could be obtained."  *Lewellen v. Raff*, 843 F.2d 1103, 1110 (8th Cir. 1988) (quoting *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981)).

"A vindictive or improper motive may," in turn, "be proved by either direct or circumstantial evidence."  *Leathers*, 354 F.3d at 961. Alternatively, a defendant may "rely on a presumption of vindictiveness," where "sufficient evidence to show a reasonable likelihood of vindictiveness exists."  *United States v. Williams*, 793 F.3d 957, 963 (8th Cir. 2015).

Rule 12 of the Federal Rules of Criminal Procedure requires that "a motion alleging a defect in instituting the prosecution," such as for vindictive prosecution, be raised by pretrial motion. Such a claim, by definition, requires the Court to consider evidence beyond the indictment itself, *see Williams*, 793 F.3d at 963, and make "findings of fact," *Chappell*,

779 F.3d at 879. The standard also contemplates that the Court will consider whether discovery or an evidentiary hearing are warranted based on the strength of the proffered evidence. *Id*. The Court's decision to permit discovery and/or to hold an evidentiary hearing are committed to the sound discretion of the Court and, thus, are reviewed for abuse of discretion. *Id*. (citing *Wayte v. United States*, 470 U.S. 598, 624 (1985)).

Mr. Johnson respectfully requests an evidentiary hearing on his outrageous government conduct and vindictive prosecution claims. The evidence adduced at such a hearing will demonstrate that the officers were acting well outside their lawful statutory and regulatory authority in engaging in vehicular pursuit and harassment of Mr. Johnson, that they seized, assaulted and arrested him all without probable cause, that they held him incommunicado at HCMC for days in violation of his Fifth and Sixth Amendment rights and repeatedly prevented him from speaking with counsel, that they permanently injured him and did so willfully and cruelly, that the government prosecuted Mr. Johnson based in part on false statements made under oath by Agent Berger and in order to chill Mr. Johnson's exercise of his First Amendment rights as well as other individuals who were considering engaging in legal observation and protest of ICE thuggery in our community, that DOJ staged Mr. Johnson's booking to obtain "trophy photos" of him and violated this Court's sealing order, all to further DOJ's public relations goals and to intimidate, harass, and prejudice Mr. Johnson at trial and chill his First Amendment rights and the rights of others.

15

In short, the evidentiary hearing will demonstrate that the ICE and CBP agents intentionally manufactured a dangerous situation designed to develop a false basis to arrest Mr. Johnson, and then those agents and the DOJ amplified this misconduct through additional constitutional violations, such that the constellation of these bad acts is so outrageous and noxious to our Constitution that the case against Mr. Johnson must be dismissed with prejudice.

## **CONCLUSION**

For the above-stated reasons, Defendant respectfully requests that the Court grant an evidentiary hearing to adduce evidence relevant to this Motion and, upon completion of that hearing, grant his Motion to Dismiss for Outrageous Government Conduct and Vindictive Prosecution.

Respectfully submitted,

Dated:   June 12, 2026

s/ *Kevin C. Riach*
Kevin C. Riach
Attorney ID No. 389277
THE LAW OFFICE OF KEVIN C. RIACH
125 Main St. SE, Suite 339
Minneapolis, MN 55414
Phone:   612-203-8555

**ATTORNEY FOR DEFENDANT**